**MAYO COLLABORATIVE SERVICES, INC., Relator,**

v.

**COMMISSIONER OF REVENUE, Respondent.**

No. A04–2190.

Supreme Court of Minnesota.

June 30, 2005.

As Amended on Denial of Rehearing July 29, 2005.

John W. Windhorst, Jr., William R. Goetz, Dorsey & Whitney, L.L.P., Minneapolis, MN, for Relator.

Mike Hatch, Attorney General, Barry R. Greller, Assistant Attorney General, St. Paul, MN, for Respondent.

## OPINION

HANSON, Justice.

We review the question of whether the MinnesotaCare tax on the gross revenues

of health-care providers transacting business in Minnesota violates the Commerce Clause of the United States Constitution because it allows an exemption for revenues received from other health-care providers who are also subject to the MinnesotaCare tax. Relator Mayo Collaborative Services, Inc. (Mayo) argues that the statute imposes an unreasonable burden on interstate commerce because it allows an exemption for intrastate transactions but not for interstate transactions. The tax court upheld the MinnesotaCare tax and affirmed the decision of respondent Commissioner of Revenue (Commissioner) to deny Mayo's claims for exemption of revenues from non-Minnesota health-care providers. *Mayo Collaborative Servs., Inc. v. Comm'r of Revenue,* No. 7605, 2004 WL 2199503 (Minn.Tax Regular Div. Sept. 21, 2004). We affirm, although on slightly different grounds.

The parties submitted the case to the tax court on stipulated facts. Mayo is a Rochester, Minnesota, medical reference laboratory that performs tests on medical samples. As a health-care provider transacting business in Minnesota, Mayo was subject to a 1.5% MinnesotaCare tax on gross revenues. Minn.Stat. §§ 295.50, subd. 4; 295.51, subd. 1; 295.52, subd. 7 (2000). To avoid "pyramiding" tax liability, Minn.Stat. § 295.53, subd. 1(a)(4)-(5) (2000) provided a resale exemption that permitted providers such as Mayo to exclude revenue received from other health-care providers that will resell Mayo's services and will themselves be subject to the MinnesotaCare tax on that resale. The

version of the statute applicable to this case contained the following exemptions:
 (a) The following payments are excluded from the gross revenues subject to the hospital, surgical center, or health care provider taxes under sections 295.50 to 295.59:
 * * * *

 (4) payments received from hospitals or surgical centers for goods and services on which liability for tax is imposed under section 295.52 * * *.
 (5) payments received from health care providers for goods and services on which liability for tax is imposed under this chapter * * *.

Minn.Stat. § 295.53, subd. 1(a)(4)-(5).[1]

For the tax years 1998 through 2001, Mayo reported its gross revenues from all sources but then deducted, as exempt, revenue received from all health-care providers, including those located and transacting business outside of Minnesota and regardless of whether the provider was liable for MinnesotaCare tax on its revenue. The Commissioner allowed Mayo to deduct as exempt revenue received from "Minnesota entities" but disallowed deductions for "non-Minnesota receipts," and then imposed an additional tax of $4,450,502 and interest of $860,977.

On appeal to the tax court, Mayo argued that the MinnesotaCare revenue exemption violated the Commerce Clause because it discriminated against interstate commerce and was not "fairly apportioned," violating two prongs of what has come to be known as the *Complete Auto* test.[2] Mayo argued that the exemption

---

1. This language now appears at Minn.Stat. § 295.53, subd. 1(a)(3)-(4) (2004).

2. In *Complete Auto Transit, Inc. v. Brady,* the United States Supreme Court said that the Commerce Clause requires state taxes to (1) have a "substantial nexus to the taxing State," (2) be "fairly apportioned," (3) not discrimi-

nate against interstate commerce, and (4) "fairly relate[ ] to the services provided by the State." 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). To show that a tax violates the clause, a taxpayer must show that the tax does not satisfy at least one of these prongs. *Barclays Bank PLC v. Franchise Tax*

facially discriminated against interstate commerce because it provided an exemption for revenue received from a provider that would resell the service in Minnesota but not from a provider that would resell the service in any other state. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575–76, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997) (stating that a tax is facially discriminatory, and therefore "virtually *per se* invalid," if it "expressly distinguishes between entities that serve a principally interstate clientele and those that primarily serve an intrastate market"). In addition, Mayo argued that the exemption was not fairly apportioned because it violated the United States Supreme Court's "internal consistency" test. *See Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) ("Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear.").

The Commissioner argued that the exemption was not facially discriminatory because, by its plain language, the exemption was based on whether the customer had already paid the tax, not on whether the customer was located out of state. The Commissioner argued that the exemption was internally consistent because the MinnesotaCare tax scheme ensures that tax is imposed on a specific medical service

only once, albeit on different taxpayers: when Mayo serves a Minnesota customer, that customer pays the MinnesotaCare tax; but when Mayo serves a non-Minnesota customer, Mayo pays the tax.[3]

The tax court held in favor of the Commissioner, reasoning that the MinnesotaCare tax exemption was not facially discriminatory because it was not based on geography, and was internally consistent and thus fairly apportioned because the tax was being assessed on a "single taxpayer, the Minnesota lab," and there was no risk that any state would impose tax on the same health-care service more than once. *Mayo Collaborative Servs.*, 2004 WL 2199503 at *7–*9.

The parties renew their arguments before this court. In addition, to demonstrate that the exemption was not geographically based and therefore not facially discriminatory, the Commissioner asserts that Mayo could not deduct revenue received from a Minnesota customer who was not subject to the MinnesotaCare tax, such as a patient who seeks Mayo's laboratory services directly without first visiting a hospital or clinic. And, to demonstrate that the MinnesotaCare tax scheme was fairly apportioned under the internal consistency test, the Commissioner argues that any threat of multiple taxation as a burden on interstate commerce is eliminated by a tax credit that is provided for a health-care

---

*Bd. of California*, 512 U.S. 298, 310–11, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994). Recently, the United States Supreme Court reaffirmed that *Complete Auto* provides a framework for determining whether a state tax violates the Commerce Clause. *Am. Trucking Ass'ns, Inc. v. Michigan Pub. Serv. Comm'n*, 545 U.S. ——, 125 S.Ct. 2419, 2426, —— L.Ed.2d ——, 2005 WL 1421164, slip op. at *6 (2005).

**3.** Before the tax court, the Commissioner also argued that Mayo had not satisfied the threshold question of whether the MinnesotaCare

tax "implicates" the Commerce Clause. *See, e.g., Stelzner v. Comm'r of Revenue*, 621 N.W.2d 736, 740 (Minn.2001) (stating that, when examining whether a state tax unduly burdens interstate commerce, this court determines (1) whether the tax "implicates" the Commerce Clause and, only if so, (2) whether the tax violates the clause). The tax court concluded that the MinnesotaCare tax did implicate the Commerce Clause and the Commissioner has not appealed that conclusion.

provider "that has paid taxes to another jurisdiction measured by gross revenues and is subject to [MinnesotaCare] tax * * * on the same gross revenues * * *." Minn.Stat. § 295.54, subd. 1 (2000). Mayo does not dispute that it could not exclude revenue received from a Minnesota patient who seeks Mayo's services directly, but argues that this is irrelevant because the exemption applies only to revenue from sales for resale, not to retail sales. As for the tax credit, Mayo argues that it is inapplicable because any health-care provider that is subject to the MinnesotaCare tax could not have "paid taxes to another jurisdiction," construing the word "paid" to mean being legally liable for the tax.

When reviewing decisions from the Minnesota Tax Court, we determine (1) whether the tax court had jurisdiction, (2) whether the tax court decision was supported by the evidence and was in conformity with the law, and (3) whether the tax court committed any other error of law. *Wilson v. Comm'r of Revenue,* 656 N.W.2d 547, 551–52 (Minn.2003); Minn. Stat. § 271.10, subd. 1 (2004). When parties stipulate to underlying facts, we need consider only whether applicable law was applied properly and our review is de novo. *Chapman v. Comm'r of Revenue,* 651 N.W.2d 825, 830 (Minn.2002).

States have wide latitude to establish taxation schemes, and "a taxpayer challenging the constitutionality of a state tax statute bears a heavy burden." *Id.;* see also *Container Corp. of Am. v. Franchise Tax Bd.,* 463 U.S. 159, 164, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (citing precedent indicating that taxpayer bears "distinct burden" of proof by "clear and cogent evidence"). "The presumption is that a statute is constitutional, and we are required to place a construction on the statute that will find it so if at all possible."

*Kline v. Berg Drywall, Inc.,* 685 N.W.2d 12, 23 (Minn.2004).

## I.

We begin by examining whether the MinnesotaCare exemption discriminates against interstate commerce, in violation of prong 3 of the *Complete Auto* test. See note 2, *supra.* The petitioner bears the burden of providing "convincing evidence showing that the tax deters, or for that matter discriminates against, interstate activities." *Am. Trucking Ass'ns, Inc. v. Michigan Pub. Serv. Comm'n,* 545 U.S. ——, 125 S.Ct. 2419, 2425, —— L.Ed.2d ——, 2005 WL 1421164, at *5 (2005). A state tax discriminates against interstate commerce if it "tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Fulton Corp. v. Faulkner,* 516 U.S. 325, 331, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996) (citations omitted). Stated another way, a state tax discriminates against interstate commerce if it gives "differential treatment [to] in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Env'tl Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). Such discrimination may occur in one of three ways: "if it is facially discriminatory, has a discriminatory intent, or has the effect of unduly burdening interstate commerce." *Amerada Hess Corp. v. Dir., Div. of Taxation, New Jersey Dep't of Treas.,* 490 U.S. 66, 75, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989); *Caterpillar, Inc. v. Comm'r of Revenue,* 568 N.W.2d 695, 699 (Minn.1997).

Mayo does not argue that the exemption had a discriminatory intent or purpose. The Commissioner suggests, and Mayo does not disagree, that the purpose of the revenue exemption was to avoid "pyramiding" tax liability, based on an intent to

avoid multiple taxation within Minnesota. We conclude that there is no basis to find that the purpose or intent of the revenue exemption was to discriminate against interstate commerce.

Likewise, Mayo does not explicitly argue that the revenue exemption was discriminatory in effect. Instead, it argues that the MinnesotaCare exemption facially discriminates against interstate commerce "because it denies an exclusion for payments received from non-Minnesota providers that is allowed for payments received from Minnesota providers." The United States Supreme Court has held that a state tax is facially discriminatory, and therefore virtually per se invalid, if it "*expressly* distinguishes between entities that serve a principally interstate clientele and those that primarily serve an intrastate market." *Camps Newfound*, 520 U.S. at 575–76, 117 S.Ct. 1590 (emphasis added).

The Commissioner argues that the MinnesotaCare tax revenue exemption does not expressly condition the exemption on where health-care providers or their customers are located, and therefore may be distinguished from cases in which we, as well as the United States Supreme Court, have held tax statutes to be facially discriminatory. *See Chapman*, 651 N.W.2d at 834 (holding that statute affording tax deduction for contributions to charity "located in and carrying on substantially all of its activities" in Minnesota was facially discriminatory because "[o]n its face, the statute treats contributions to in-state charitable organizations differently from contributions to out-of-state charitable organizations"); *Oregon Waste Sys., Inc.*, 511 U.S. at 96, 100, 114 S.Ct. 1345 (holding solid-waste surcharge based on costs attributable to handling out-of-state waste facially discriminatory because the "geographic distinction * * * patently dis-criminates against interstate commerce"); *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 338, 344, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992) (holding state surcharge on solid waste "generated outside of Alabama" facially discriminatory).

Mayo suggests that the requirement that the geographic distinction be express was invalidated in *Camps Newfound*, a case involving a Maine statute that limited property tax relief for charities incorporated in the state that were "in fact conducted or operated principally for the benefit of persons who are not residents of Maine." 520 U.S. at 568, 117 S.Ct. 1590 (quoting Me.Rev.Stat. Ann., Tit. 36, § 652(1)(A) (Supp.1996)). The Court held the statute facially discriminatory because the tax burden was "felt almost entirely by out-of-staters, deterring them from enjoying the benefits of camping in Maine." *Camps Newfound*, 520 U.S. at 581, 117 S.Ct. 1590. But, like the statutory language in *Chapman*; *Oregon Waste*, and *Chemical Waste*, the statute in *Camps Newfound* was explicitly based on geography—whether benefits were enjoyed by "persons who are not *residents* of Maine." *Camps Newfound*, 520 U.S. at 568, 117 S.Ct. 1590 (emphasis added). By contrast, the MinnesotaCare exemption is based on whether the revenue is received from a hospital, surgical center, or a health-care provider on whom "liability for tax is imposed," without explicit reference to the location of that provider. Minn.Stat. § 295.53, subd. 1(a)(4)-(5).

Mayo suggests that a specific reference to geography is unnecessary for facial discrimination and refers us to *Armco Inc. v. Hardesty*, 467 U.S. 638, 642–43, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984), and *Tyler Pipe Industries, Inc. v. Washington Department of Revenue*, 483 U.S. 232, 240–41, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), as holding that the taxes challenged in

those cases were "facially discriminatory because of their potential impact on interstate commerce." We find these two cases to be the most relevant to our consideration.

In *Armco*, the Court held that the West Virginia gross receipts tax on wholesale sales of tangible property within the state was facially discriminatory because it exempted sales by domestic manufacturers who were obligated to pay a higher manufacturing tax on the value of products manufactured in West Virginia. 467 U.S. at 642–43, 104 S.Ct. 2620. The Court determined that the wholesale tax, "on its face," taxes a wholesale transaction "more heavily when it crosses state lines than when it occurs entirely within the state." *Id.* at 642, 104 S.Ct. 2620. The Court reasoned:

> The tax provides that two companies selling tangible property at wholesale in West Virginia will be treated differently depending on whether the taxpayer conducts manufacturing in the State or out of it.

*Id.*

In *Tyler Pipe*, the Court held that a Washington manufacturing tax on the value of products manufactured in Washington was facially discriminatory against interstate commerce because it exempted that portion of a domestic manufacturer's output that was subject to Washington's gross proceeds tax on wholesale sales within the state. 483 U.S. at 240–41, 107 S.Ct. 2810. The Court determined that Washington's "exemption for manufacturers that sell their products within the State has the same facially discriminatory

consequences as the West Virginia exemption we invalidated in *Armco*." *Id.* at 240, 107 S.Ct. 2810.

*Armco* and *Tyler Pipe* each involved a taxing structure that had some aspects that were parallel to the MinnesotaCare tax. Each contained a multiple transaction exemption that was designed to avoid the pyramiding of taxation—that is, West Virginia exempted a manufacturer from the wholesale tax to the extent it was subject to West Virginia's tax on manufacturing; Washington exempted a manufacturer from the manufacturing tax to the extent it was subject to Washington's tax on wholesale sales; and Minnesota exempted a health-care provider from the gross revenues tax on health-care services to the extent that another health-care provider was subject to the MinnesotaCare tax on the same services. *Armco* and *Tyler Pipe* support Mayo's facial discrimination argument to the extent that the exemptions in West Virginia and Washington were based on the fact that the taxable transaction was subject to a separate tax of the same state and that separate tax could be applicable only to intrastate transactions.[4]

In *Tyler Pipe*, the Court suggested that to avoid discrimination against interstate commerce, a multiple activities exemption should "provide a credit against Washington tax liability for wholesale taxes paid by local manufacturers to any State, not just Washington." 483 U.S. at 246, 107 S.Ct. 2810. Extrapolating this reasoning to the MinnesotaCare tax, one could suggest that to avoid discrimination against interstate commerce, the Minnesota exemption

---

**4.** *Armco* and *Tyler Pipe* seem to place less reliance on the requirement that the geographic distinctions be "express" because, in essence, the exemptions were measured (as in the MinnesotaCare tax exemption) by whether the transaction was subject to another tax.

*Armco* and *Tyler Pipe* can be read to support the conclusion that the exemptions were sufficiently transparent to satisfy the "express" requirement because the transaction could be subject to the other tax only if that transaction was conducted intrastate.

should have applied to gross revenues from a transaction that was subject to a separate gross revenue tax in any state, not just in Minnesota.

In *Jefferson Lines*, the Court posited a hypothetical tax structure that also had some parallel aspects to *Armco*; *Tyler Pipe*, and the MinnesotaCare tax. *Jefferson Lines*, 514 U.S. at 192 n. 6, 115 S.Ct. 1331. The Court explained:

> [I]f Texas were to impose a tax upon the bus company measured by the portion of gross receipts reflecting in-state travel, it would have to impose taxes on intrastate and interstate journeys alike. In the event Texas chose to limit the burden of successive taxes attributable to the same transaction by combining an apportioned gross receipts tax with a credit for sales taxes paid to Texas, for example, it would have to give equal treatment to service into Texas purchased subject to a sales tax in another State, which it could do by granting a credit for sale taxes paid to any State.

*Id.* at 192 n. 6, 115 S.Ct. 1331.[5]

Although *Armco*; *Tyler Pipe*, and the footnote hypothetical in *Jefferson Lines* might be read to suggest that a tax exemption such as Minnesota's is facially discriminatory if applied to in-state sales but denied to out-of-state sales, there is a crucial distinction between those circumstances and this case. In *Armco*; *Tyler Pipe*, and the *Jefferson Lines* hypothetical, the successive taxation fell upon the same taxpayer. Here, the successive tax on which the exemption is based is paid by a third par-

ty. And in *Jefferson Lines*, the Court concluded the hypothetical discussion by stating, "We express no opinion on the need for equal treatment when a credit is allowed for payment of in—or out-of-state taxes by a third party. *See Darnell v. Indiana*, 226 U.S. 390, 33 S.Ct. 120, 57 L.Ed. 267 (1912)." *Jefferson Lines*, 514 U.S. at 193 n. 6, 115 S.Ct. 1331.

*Darnell* involved an Indiana tax on stock owned by a taxpayer domiciled in Indiana. All shares of stock whether in domestic or foreign corporations were subject to the tax, but there was an exemption for shares of a corporation where the property of the corporation "is not exempt or is not taxable to the corporation itself." 226 U.S. at 397, 33 S.Ct. 120. In other words, the ownership tax would not apply to domestic stock if the property of the domestic corporation was taxed in Indiana, but ownership of foreign stock was taxed even if the property of the foreign corporation was taxed in another jurisdiction. The Court held that this did not violate the Commerce Clause because Indiana was entitled to treat the foreign stock as untaxed for Indiana taxation purposes because the property of the foreign corporation was not taxed in Indiana. *Id.* at 398, 33 S.Ct. 120.

The Court said that this conclusion followed *Kidd v. Alabama*, 188 U.S. 730, 23 S.Ct. 401, 47 L.Ed. 669 (1903), involving an Alabama tax on stock ownership. The Alabama statute taxed the ownership of domestic stock, but gave a credit/exemption for equivalent taxes paid on the property of the domestic corporation. Ownership of foreign stocks was taxed with no

---

5. Interestingly, despite this statement that Texas would have to extend any credit for sales taxes paid to both in-state and out-of-state taxes, the Court then seemed to backtrack, stating:

> Although we have not held that a State imposing an apportioned gross receipts tax that grants a credit for sales taxes paid in state must also extend such a credit to sales

taxes paid out of state, we have noted that equality of treatment of interstate and intrastate activity has been the common theme among the paired (or "compensating") tax schemes that have passed constitutional muster.

*Jefferson Lines*, 514 U.S. at 193 n. 6, 115 S.Ct. 1331 (citations omitted).

credit for taxes paid on the foreign corporations' property in other states. In *Kidd*, the Court said:

> The state of Alabama is not bound to make its laws harmonize in principle with those of other States. If property is untaxed by its laws, then for the purpose of its laws the property is not taxed at all.

*Id.* at 732, 23 S.Ct. 401.[6]

Because Mayo bears a heavy burden to provide "convincing evidence" that the MinnesotaCare tax is discriminatory, *see Am. Trucking Ass'ns, Inc.,* —— U.S. ——, 125 S.Ct. 2419, 2425, —— L.Ed.2d ——, 2005 WL 1421164, and because decisions of the United States Supreme Court suggest that the Interstate Commerce Clause does not require equal treatment when an exemption is allowed for payment by a third party of a separate in-state tax but not of a separate out-of-state tax, we affirm the tax court's conclusion that the MinnesotaCare statute is not facially discriminatory under *Complete Auto. Mayo Collaborative Servs.,* 2004 WL 2199503 at *8.

### II.

Next, we consider whether the MinnesotaCare tax revenue exemption was "fairly apportioned" under prong 2 of the *Complete Auto* test, which now incorporates the United States Supreme Court's "internal consistency" test.

 "[T]he central purpose behind the apportionment requirement is to ensure that each State taxes only its fair share of an interstate transaction." *Goldberg v. Sweet,* 488 U.S. 252, 260–61,

109 S.Ct. 582, 102 L.Ed.2d 607 (1989). This principle is "the lineal descendant of [the] prohibition of multiple taxation, which is threatened whenever one State's act of overreaching combines with the possibility that another State will claim its fair share of the value taxed." *Jefferson Lines,* 514 U.S. at 184, 115 S.Ct. 1331. "A tax that unfairly apportions income from other States is a form of discrimination against interstate commerce." *Tyler Pipe,* 483 U.S. at 247, 107 S.Ct. 2810 (quoting *Armco,* 467 U.S. at 644–45, 104 S.Ct. 2620); *see also* Bradley W. Joondeph, *The Meaning of Fair Apportionment and the Prohibition on Extraterritorial State Taxation,* 71 Fordham L. Rev. 149, 182 (2002) ("Properly understood, fair apportionment is a 'second order' constitutional value, a means to effectuate the 'higher order' objectives of preventing discrimination against interstate commerce and to ensure that states have a sufficient nexus with the values they seek to tax.").

Recently, in *American Trucking Associations, Inc. v. Michigan Public Service Commission,* the Supreme Court observed that the internal consistency test is "typically used where taxation of interstate transactions are at issue," the relevant inquiry being: "What would happen if all States did the same?" 125 S.Ct. at 2425, 2005 WL 1421164, at *6. At issue was whether Michigan's $100–per–vehicle annual fee on trucks that perform point-to-point deliveries inside state borders was constitutional given that truckers typically "top off" interstate loads with intrastate loads. *Id.* at 2424–25, 2005 WL 1421164 at

**6.** We recognize that in *Fulton Corp. v. Faulkner,* where the "only issue" was whether a facially discriminatory tax was nevertheless constitutional as a "compensatory" tax, the Supreme Court held that *Darnell* and *Kidd* were "no longer good law under the Commerce Clause." *Fulton,* 516 U.S. at 333–34, 346. But we read this holding as distinguishing *Darnell* and *Kidd* for the constitutional standard that a state must satisfy to justify a facially discriminatory tax—"strictest scrutiny" not "rational basis." *Id.* at 345–46. This

distinction is not material to our analysis of whether the MinnesotaCare tax is facially discriminatory. Further, we cannot ignore that when the tax liability of a third-party is involved, the Court signaled in *Jefferson Lines* that *Darnell* remains relevant. *See Jefferson Lines,* 514 U.S. 192–93 n.6. Thus, when we view *Jefferson Lines* and *Fulton* together, we conclude that *Darnell* and *Kidd* remain relevant when, as here, a taxpayer's claim that a tax is facially discriminatory is premised on a third party's tax burden.

*2, *4, *6. The Court observed that it "must concede" that a trucker would be subject to multiple fees if states besides Michigan enacted such laws, but nevertheless held that the tax was constitutional because "[a]n interstate firm with local outlets normally expects to pay local fees that are uniformly assessed upon all those who engage in local business." *Id.* at 2425, 2005 WL at *6.

■ Because *American Trucking* was decided after oral argument, Mayo and the Commissioner argued apportionment of the MinnesotaCare exemption primarily under *Jefferson Lines*, which at the time provided the Supreme Court's most-recent guidance on the question. After reiterating that the possibility of multiple taxation is the central question, the Court observed that the "threat of malapportionment" is subject to the "internal consistency" rule: [7]

Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax.

*Jefferson Lines*, 514 U.S. at 185, 115 S.Ct. 1331.

Given that neither the MinnesotaCare tax nor the exemption involves an "interstate transaction," the internal consistency test may be inapplicable. *See American Trucking*, 125 S.Ct. at 2425, 2005 WL 1421164, at *6. Even if the test applies, the holding in *American Trucking* suggests that a tax that fails the test is not per se unconstitutional. *See id.* Accordingly, we turn our analysis to *Jefferson Lines*, where the issue was whether an Oklahoma sales tax imposed on bus tickets sold in the state for travel within as well as outside the state was fairly apportioned. 514 U.S. at 177, 115 S.Ct. 1331. The Court held that the tax was fairly apportioned because it was internally and externally consistent and because there was no threat of multiple taxation. *Id.* at 184–88, 194–95, 115 S.Ct. 1331. "If every State were to impose a tax identical to Oklahoma's, that is, a tax on ticket sales within the State for travel originating there, no sale would be subject to more than one State's tax." *Id.* at 185, 115 S.Ct. 1331.

In *Jefferson Lines*, the Court discussed two distinctions that are relevant to our facts. First, the Court suggested that the

---

7. The use of the "internal consistency" test to determine fair apportionment first surfaced in *Container Corp. of America v. Franchise Tax Board,* a case involving a state "unitary business" tax where the Court held that the first inquiry as to fair apportionment "is what might be called internal consistency—that is the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business's income being taxed." 463 U.S. at 169, 103 S.Ct. 2933. The Court then applied the internal consistency test to invalidate three state taxes, but not explicitly under the fair apportionment prong. *Am. Trucking Ass'ns, Inc., v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987); *Tyler Pipe,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199; *Armco,* 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540. In *Scheiner,* the Court held a state flat tax unconstitutional because it was not internally consistent and was not a "reasonable charge." 483 U.S. at 284, 278–89, 107 S.Ct. 2829. In *Tyler Pipe* and *Armco,* the Court cited the internal consistency test and then commingled the discrimination prong with the fair apportionment prong, observing in both cases that a "tax that unfairly apportions income from other States is a form of discrimination against interstate commerce." *Tyler Pipe,* 483 U.S. at 247, 107 S.Ct. 2810; *Armco,* 467 U.S. at 644, 104 S.Ct. 2620.

apportionment prong is concerned with multiple taxation through more than one jurisdiction imposing tax on a single transaction. The Court explained that the essential purpose of the apportionment prong is to assure that a state imposes tax only on its fair share of an interstate transaction, and notes that this principle is "the lineal descendent of [the] prohibition of multiple taxation." *Id.* at 184, 115 S.Ct. 1331. When the Court referred to multiple taxation of a single interstate transaction, the references are all singular—to a buyer, a sale, a transaction. As applied to Mayo, then, *Jefferson Lines* suggests that a central question is whether a single transaction—here, a laboratory service—is subject to more than one jurisdiction's tax. Clearly, only Minnesota may impose tax on this transaction because the service occurs within Minnesota's borders. But our analysis cannot end here.

Beyond framing its analysis of multiple taxation in terms of a single taxable event, the Court in *Jefferson Lines* also referenced serial taxable events. But those references indicate that multiple taxation is not problematic in such situations. For example, in explaining that a sale of goods in a single transaction cannot be subject to multiple taxation, the Court explained:

In deriving this rule covering taxation to a buyer on sales of goods we were not, of course, oblivious to the possibility of successive taxation of related events up and down the stream of commerce, and our cases are implicit with the understanding that *the Commerce Clause does not forbid the actual assessment of a succession of taxes by different States on distinct events as the same tangible object flows along.* Thus, it is a truism that a sales tax to the buyer does not preclude a tax to the seller upon the income earned from a sale, and there is no constitutional trouble inherent in the imposition of a sales tax in the State of delivery to the customer, even though the State or origin of the things sold

may have assessed a property or severance tax on it.

*Id.* at 187–88, 115 S.Ct. 1331 (emphasis added).

Later in the *Jefferson Lines* opinion, the Court addressed another aspect of successive taxation, asking:

Although the sale with partial delivery cannot be duplicated as a taxable event in any other State, and multiple taxation under an identical tax is thus precluded, is there a possibility of successive taxation so closely related to the transaction as to indicate potential unfairness of Oklahoma's tax on the full amount of sale?

*Id.* at 191, 115 S.Ct. 1331. In this part of its analysis (apparently the external consistency element), the Court concluded that even if Texas were to apply an apportioned gross receipts tax on the Texas portion of the travel from Oklahoma City to Dallas, this would not constitute impermissible multiple taxation because

interstate travel would not be exposed to multiple taxation in any sense different from coal for which the producer may be taxed first at point of severance by Montana and the customer may later be taxed upon its purchase in New York. The multiple taxation placed upon interstate commerce by such a confluence of taxes is not a structural evil that flows from either tax individually, but it is rather the "accidental incident of interstate commerce being subject to two different taxing jurisdictions."

*Id.* at 192, 115 S.Ct. 1331 (footnote omitted).

The footnote to the above quotation addressed the issue of successive and complementary taxes at some length. *Id.* at 192–93 n. 6, 115 S.Ct. 1331. In this discussion, the Court again used the singular, referencing "the same transaction" several times. Based on these references in the

*Jefferson Lines* opinion, it appears that the apportionment factor is aimed at multiple taxation of the same transaction. As applied here, there is no multiple taxation by other jurisdictions of Mayo's laboratory services.

The second distinction in *Jefferson Lines* relevant here is the Court's differentiation between "activities"-based taxes imposed on businesses that operate in several states, and taxes based on sales of goods and services. *Id.* at 186, 115 S.Ct. 1331. As for the activities-based taxes, the Court observed that taxes should be proportionate to activities that actually take place in the taxing jurisdiction, and that this often triggers an analysis that "center[s] around specific formulas for slicing a taxable pie among several States in which the taxpayer's activities contributed to taxable value." *Id.* (citing *Container Corp. of Am.,* 463 U.S. at 170, 103 S.Ct. 2933; *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 270, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978); *Central Greyhound Lines, Inc., v. Mealey,* 334 U.S. 653, 663, 68 S.Ct. 1260, 92 L.Ed. 1633 (1948)).

As for sales-based taxes, the Court observed that it has "set a different course," and that the Commerce Clause does not require a tax to be apportioned to where a good ultimately is consumed:

> A sale of goods is most readily viewed as a discrete event facilitated by the laws and amenities of the place of sale, and the transaction itself does not readily reveal the extent to which completed or anticipated interstate activity affects the value on which a buyer is taxed. We have therefore consistently approved taxation of sales without any division of the tax base among different States, and have instead held such taxes properly measurable by the gross charge for the purchase, regardless of any activity outside the taxing jurisdiction that might

have preceded the sale or might occur in the future.

\* \* \* \*

> In other words, the very conception of the common sales tax on goods, operating on the transfer of ownership and possession at a particular time and place, insulated the buyer from any threat of further taxation of the transaction.

*Id.* at 186–87, 115 S.Ct. 1331 (citing *Wardair Canada, Inc., v. Florida Dep't of Revenue,* 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986); *State Tax Comm'n of Utah v. Pacific States Cast Iron Pipe Co.,* 372 U.S. 605, 83 S.Ct. 925, 10 L.Ed.2d 8 (1963); *McGoldrick v. Berwind–White Coal Mining Co.,* 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565 (1940)). The Court further held that for fair apportionment purposes, sales of services are indistinguishable from sales of goods. *Id.* at 188, 115 S.Ct. 1331.

■ On its face, the MinnesotaCare tax is based on whether a health-care provider "transact[s] business" in Minnesota, e.g., performs "activities" in the state. Minn.Stat. § 295.51, subd. 1; *see Jefferson Lines,* 514 U.S. at 186, 115 S.Ct. 1331. But unlike the facts to which the activities-based taxes discussed in *Jefferson Lines* were applied, the activities of Mayo that we consider here all occur within a single jurisdiction. And the MinnesotaCare tax exemption is essentially sales-based—it exempts revenue received from another provider who already was subject to the MinnesotaCare tax for the same "goods and services." Thus, as applied to Mayo, the combination of the tax and tax exemption more closely resembles a sales-based tax because the only services relevant to our analysis are those that Mayo performs wholly within Minnesota's borders. The imposition of the MinnesotaCare tax at the place where Mayo's services are performed insulates Mayo's customer from

any threat of further taxation on those services. *See American Trucking*, 125 S.Ct. at 2423, 2005 WL 1421164, at *3 (upholding tax in part because the assessment "does not reflect an effort to tax activity that takes place, in whole or in part, outside the State").

Mayo employs a hypothetical under the internal consistency test to suggest that if Wisconsin had a law identical to MinnesotaCare and Mayo had a Wisconsin hospital as a customer, Mayo would pay Minnesota taxes on revenue received from its sale to the Wisconsin hospital, Mayo would pass through that tax in its charges to the hospital, and the hospital would also pay Wisconsin taxes on revenue it received from resale of Mayo's service to the patient. Mayo argues that this potential for multiple taxation in an interstate transaction would not exist in a comparable intrastate transaction because Mayo would be able to exempt the revenue received from its sale of services to a Minnesota hospital because the resale of those services to the patient would be subject to the tax, resulting in only a single tax being applied to the intrastate sale and resale of lab services.

The Commissioner argues that Mayo's hypothetical is analytically incorrect because it looks at the combined effect of two states' taxes on two separate taxpayers (e.g., the Minnesota tax on Mayo and the Wisconsin tax on Mayo's health-care provider customer). The Commissioner suggests that the critical question for internal consistency is whether the lab services would be taxed more than once and that question must be analyzed in the context of a "single taxpayer." The tax court agreed, concluding that Mayo's example only "demonstrates that intrastate commerce is discriminated against in the state which fails to provide a credit for lab services rendered and already taxed in another state, not that interstate commerce is

bearing any additional tax burden." *Mayo Collaborative Servs., Inc.*, 2004 WL 2199503 at *8.

We agree with the Commissioner and the Tax Court that Mayo's hypothetical fails to prove that the MinnesotaCare tax scheme is internally inconsistent. Mayo's argument is that an out-of-state buyer risks paying state taxes twice-once when the hospital pays Wisconsin tax upon reselling Mayo's services, and again when Mayo "passes through" its Minnesota tax burden to its customer. This argument would require us to characterize the "pass through" charge as an imposition of the Minnesota tax. This we are not prepared to do given the Court's observation in *Jefferson Lines* that a sales-based tax

> falls on the buyer of the services, who is no more subject to double taxation on the sale of these services than the buyer of goods would be. The taxable event comprises agreement, payment, and delivery of some of the services in the taxing State; no other State can claim to be the site of the same combination.

514 U.S. at 190, 115 S.Ct. 1331.

In addition, in *Jefferson Lines*, the Court held that even under the internal consistency test, "the Commerce Clause does not forbid the actual assessment of a succession of taxes by different States on distinct events as the same tangible object flows along." *Id.* at 187–88, 115 S.Ct. 1331. The Court acknowledged that successive taxes might be unfairly apportioned if "there is a possibility of successive taxation so closely related to the transaction as to indicate potential unfairness of [the selling jurisdiction's] tax on the full amount of sale," or if "the very possibility of apportioning * * * [is] a sufficient reason to conclude that the tax exceeds the fair share of the State of sale." *Id.* at 191, 115 S.Ct. 1331. But the taxpayer-buyers in *Jefferson Lines* "failed to

raise any specter of successive taxes that might require us to reconsider whether an internally consistent tax on sales of services could fail the external consistency test for lack of further apportionment (a result that no sales tax has ever suffered under our cases)." *Id.* at 192, 115 S.Ct. 1331 (parenthetical in Court's opinion). "Nor has the taxpayer made out a case that Oklahoma's sales tax exposes any buyer of a ticket in Oklahoma for travel into another State to multiple taxation." *Id.* at 193, 115 S.Ct. 1331. Similarly, Mayo has raised no "specter" of actual successive taxation that might render the internally consistent tax scheme unfair.

Finally, even if the MinnesotaCare tax scheme could be considered internally inconsistent because, as Mayo argues, Mayo's pass-through of the Minnesota tax to a Wisconsin customer was deemed to be the imposition of the Minnesota tax on that customer, any potential for unfair apportionment would be eliminated by the MinnesotaCare credit provision.

The Supreme Court has signaled, and other courts and commentators agree, that any credit that serves to alleviate the threat of multiple taxation must be considered under the fair apportionment prong. *Jefferson Lines,* 514 U.S. at 194, 115 S.Ct. 1331 ("Oklahoma may rely upon use-taxing States" to provide a credit "for related taxes paid elsewhere"); *Tyler Pipe,* 483 U.S. at 245 n. 13, 107 S.Ct. 2810 (observing that tax would have been fairly apportioned had state provided "tax credits" that would "alleviate or eliminate the potential multiple taxation"); *Goldberg,* 488 U.S. at 261, 264, 109 S.Ct. 582 (Illinois taxing scheme fairly apportioned because it was internally consistent and because credit provision "operates to avoid actual multiple taxation"); *Gen. Motors Corp. v. City & County of Denver,* 990 P.2d 59, 69 (Colo.1999) (holding fair apportionment

prong satisfied if tax relates to activity taking place within state or if credit is provided for similar taxes paid in other jurisdictions); Walter Hellerstein, *Is "Internal Consistency" Foolish?: Reflections on an Emerging Commerce Clause Restraint on State Taxation,* 87 Mich. L. Rev. 138, 182–83 (1988) ("A tax that appears to be internally inconsistent will nevertheless pass the 'internal consistency' test if the taxing state grants a credit for taxes paid to other states on the same tax base."). *But see Tennessee Gas Pipeline Co. v. Urbach,* 96 N.Y.2d 124, 726 N.Y.S.2d 350, 750 N.E.2d 52, 59 (2001) (holding credit provision "invalid" because court would need "to define the parameters of the credit and the manner in which it will be implemented," in violation of separation of powers).

The relevant version of the MinnesotaCare tax credit, Minn.Stat. § 295.54, subd. 1 (2000), stated:

> A hospital, surgical center, or health care provider that has *paid taxes to another jurisdiction* measured by gross revenues and is subject to tax under sections 295.52 to 295.59 *on the same gross revenues* is entitled to a credit for the tax legally due and paid to another jurisdiction to the extent of the lesser of (1) the tax actually paid to the other jurisdiction, or (2) the amount of tax imposed by Minnesota on the gross revenues subject to tax in the other taxing jurisdictions.

(Emphasis added.) Mayo argues that, properly construed, the credit would never have been available to the hypothetical Wisconsin hospital. Mayo focuses on two parts of the credit, suggesting (1) that the Wisconsin hospital would not have "paid taxes" to Minnesota because the Minnesota tax would be paid by Mayo and (2) that the gross revenues of Mayo that were the basis for the Minnesota tax would not be

the "same gross revenues" as the revenues of the Wisconsin hospital that would be subject to the Wisconsin tax. We disagree with Mayo's construction for several reasons.

First, we are to presume that the legislature did not intend for the statute to violate the United States Constitution. Minn.Stat. § 645.17 (2004). Accordingly, "[w]here a[tax] statute is ambiguous, the construction that will avoid constitutional conflict is to be preferred, even though it is less natural." *Schumann v. Comm'r of Taxation,* 312 Minn. 477, 481–82, 253 N.W.2d 130, 132 (1977). This rule of construction is a corollary to rule that Mayo bears the burden of proving that the tax is unconstitutional. *Chapman,* 651 N.W.2d at 830.

Second, as to the words "paid taxes," Mayo cannot have it both ways. If the words "paid taxes" do not include Mayo's pass-through of the Minnesota tax to the Wisconsin customer, then there is no risk of multiple taxation of the Wisconsin customer and no internal inconsistency. But if we accept Mayo's hypothetical to the contrary, we would then be persuaded by the Commissioner's counter argument that the words "paid taxes" should be construed to include a party who bears the economic incidence of the tax, not just the party who bears the legal incidence of the tax. For purposes of the hypothetical, Mayo and the Commissioner agree that it is reasonable to assume that Mayo would pass through the MinnesotaCare tax to the Wisconsin hospital. This assumption means that the hypothetical Wisconsin hospital would bear the economic incidence of the Minnesota tax and would thereby be eligible to claim the credit. Or, in the alternative, the hospital could claim a credit from Wisconsin, which under Mayo's hypothetical we must assume has adopted a credit provision identical to Minnesota's.

This interpretation of the words "paid taxes" is supported by legislative history. As originally enacted, the credit used language that would be more supportive of Mayo's interpretation. It offered a credit to any "resident" Minnesota health-care provider that was "liable for taxes payable" in another jurisdiction.[8] Act of April 23, 1992, ch. 549, art. 9, § 9, 1992 Minn. Laws 1487, 1614 (codified at Minn. Stat. § 295.54 (1992)). But in 1996, as a result of circumstances we will describe below, the legislature amended this language by broadening the availability of the credit from a "resident hospital or resident health care provider who is liable for taxes" in another jurisdiction to a "hospital, surgical center, pharmacy, or health care provider that has paid taxes" to another jurisdiction. Act of April 12, 1996, ch. 471, art. 6, § 9, 1996 Minn. Laws 1717, 1814 (codified at Minn.Stat. § 295.54, subd. 1 (1996)). Because the persons who are entitled to the credit under the 1996 amendment include both resident and nonresident providers, and only a resident provider would be directly liable for MinnesotaCare taxes, the words "paid taxes" must include those who paid the tax indirectly, as through a pass-through charge. Accordingly, we construe the words "paid taxes" to include a Wis-

---

8. The credit provided:

A resident hospital or resident health care provider who is liable for taxes payable to another state or province or territory of Canada measured by gross receipts and is subject to tax under section 295.52 is entitled to a credit for the tax paid to another state or province or territory of Canada to the extent of the lesser of (1) the tax actually paid to the other state or province or territory of Canada, or (2) the amount of tax imposed by Minnesota on the gross receipts subject to tax in the other taxing jurisdictions.

Minn.Stat. § 295.54 (1992).

consin health-care provider that would bear the economic incidence of the MinnesotaCare tax when that tax is passed through by Mayo in its charges for laboratory services.

Third, as to the words "same gross revenues," we are persuaded that those words should be construed as a generic reference to the type of revenues that are subject to the MinnesotaCare tax, and include both the revenue on the original sale and the revenue on the resale of the same qualifying services.

Fourth, our acceptance of this broad construction of the "same gross revenues," and our broad reading of "paid taxes," are supported by the observation that, if the credit is not read broadly to apply to the hypothetical Wisconsin hospital, we cannot conceive of any situation to which it would apply. If the credit is construed narrowly, as Mayo suggests, the credit would never be available because a Wisconsin hospital would never be legally liable for the Minnesota tax imposed on its payment to Mayo for services that Mayo performed in Minnesota. Such a narrow reading conflicts with our assumption that every section of a statute has a purpose, and that no statutory language "should be deemed superfluous, void, or insignificant." *Vlahos v. R & I Const. of Bloomington, Inc.*, 676 N.W.2d 672, 679 (Minn.2004).

At oral argument, Mayo argued that its narrow construction of the credit would not make it meaningless. Mayo suggested that when the MinnesotaCare tax was originally enacted, it made nonresident hospitals subject to MinnesotaCare tax on any revenues from "patients domiciled in Minnesota." Act of April 23, 1992, ch. 549, art. 9, § 5, 1992 Minn. Laws 1487, 161 (codified at Minn. Stat § 295.50, subd. 3(a)(2) (1992)). Mayo argued that the purpose for the credit was to save these nonresident hospitals from the threat of double taxation if they were subject to the same tax by the state of their residence.

But this argument fails because, first, the credit as originally enacted applied only to "resident" providers and, second, the legislature retained and even expanded the credit after it removed nonresident hospitals from the tax. In 1993, physicians domiciled in Wisconsin, Iowa, and South Dakota sought an injunction to prevent application of the MinnesotaCare tax to them as nonresident providers, claiming violations of the Due Process and Commerce Clauses of the United States Constitution.[9] The district court employed the Commerce Clause to permanently enjoin the Commissioner from applying the MinnesotaCare tax to nonresident health-care providers, observing that "[a]s written, the Act's reach is nationwide." *Baertsch v. Minnesota Dep't of Revenue*, No. C7–93–2680 (Ramsey County Dist. Ct., Sept. 15, 1994). In response to this ruling, the legislature amended the statute in 1996 to remove nonresident providers from the tax, but it retained the credit and, in fact, amended it to eliminate the restriction to resident providers and to clarify that the credit required only that the provider have "paid taxes" to another jurisdiction, not that it have been "liable for" taxes in another jurisdiction. Act of April 12, 1996, ch. 471, art. 6, §§ 1, 9, 1996 Minn. Laws 1717, 1810, 1814 (codified at Minn.Stat. §§ 295.50, subd. 3, and 295.54, subd. 1 (1996)). Obviously, the legislature intended that the credit would apply to some situation other than that of the nonresident hospitals.

The existence of the credit, as thus construed, eliminates any hypothetical burden on interstate commerce. A Minnesota

---

9. We ruled that the dispute was ripe and that the district court had jurisdiction. *Baertsch v. Minnesota Dep't of Revenue*, 518 N.W.2d 21 (Minn.1994).

hospital would not be encouraged to purchase all laboratory services in Minnesota because it would be entitled to credit any economic incidence of a tax imposed by another state on services bought from a provider in that state against the MinnesotaCare tax otherwise imposed on the revenue it received from the resale of those services to a patient in Minnesota. Likewise, a Wisconsin hospital would not be discouraged from purchasing its laboratory services in interstate commerce for the same reason.

We conclude that Mayo has not met its burden of proving that the MinnesotaCare tax revenue exemption, Minn.Stat. § 295.53, subd. 1(a)(4)-(5), is either unfairly apportioned or discriminatory under *Complete Auto,* and hold that the provision is constitutional under the Commerce Clause of the United States Constitution. We affirm the decision of the tax court.

Affirmed.