Marcus Robert URBAN,
et al., Appellants,

v.

The AMERICAN LEGION DE-
PARTMENT OF MINNE-
SOTA, Respondent,

The American Legion and its
Subdivisions, Respondent.

No. A04–1409.

Supreme Court of Minnesota.

Oct. 19, 2006.

Leo F. Feeney, Richard L. Gill, Randall Matthew Tietjen, Robins, Kaplin, Miller & Ciresi, L.L.P., Minneapolis, for appellant.

Daniel A. Haws, Thomas A. Gilligan, Murnane, Conlin, White & Brandt, St. Paul, William M. Hart, Jenneane, L. Jansen, Melissa Dosick Riethof, Meagher & Geer, P.L.L.P., Minneapolis, Donald H. Walser, Judge Advocate, Dept. of MN, Kraft, Walser, Hettig, & Honsey, Hutchinson, for respondent.

Mike hatch, Atty. Gen., St. Paul, for amicus.

# OPINION

ANDERSON, G. BARRY, Justice.

The tragedy that gives rise to this litigation occurred on August 10, 2000, when a drunk driver struck the Urban family car, leaving wife and mother Barbara Urban dead and children Marcus and Brett Urban with serious and lifelong injuries. The Urbans sued American Legion Post 184 under the Civil Damages Act, Minn.Stat. §§ 340A.801–.802 (2004) ("CDA"), alleging that Post 184 illegally served the drunk driver alcohol on the night he struck the Urbans. Later, the Urbans additionally sued the American Legion Department of Minnesota (the Department) and the American Legion National (National) under several theories, including alter ego, joint venture, and respondeat superior. The district court granted summary judgment for the Department and National on all grounds, and the court of appeals affirmed. We granted the Urbans' petition for review on only the question of whether the Department and National can be held liable under the CDA via respondeat superior. We now affirm the court of appeals, but on other grounds.

On August 10, 2000, appellant Todd Urban, his wife, Barbara Urban, and their three sons, appellants Marcus, Michael, and Brett Urban, were driving south on Highway 52 in Goodhue County. Orvin Rolland was driving north in the south-

bound lane and hit the Urban vehicle head-on. As a result of the collision, Barbara Urban died, Marcus Urban was rendered a paraplegic, and Brett Urban suffered serious brain damage.

The Urbans brought an action against Post 184 and the Pine Island Municipal Liquor Store under the CDA for the illegal sale of alcohol to Rolland. The Urbans additionally brought suit under the CDA against National and the Department, alleging vicarious liability under several theories, including respondeat superior. Both National and the Department moved for summary judgment, the district court granted both motions for summary judgment, and the Urbans appealed. The court of appeals affirmed the summary judgment. *Urban v. American Legion Post 184*, 695 N.W.2d 153 (Minn.App.2005). We granted review on the issue of whether the Department and National could be held vicariously liable on a respondeat superior theory for Post 184's allegedly tortius liquor sale.

In order to understand the arguments of the parties, it is first necessary to understand the organizational structure of the American Legion. The American Legion is a mutual aid and community service organization for veterans, and was created by the federal government in 1919. 36 U.S.C. §§ 21701–21708 (2002) (initially enacted as Act of Sept. 16, 1919, ch. 59, 41 Stat. 284). Membership eligibility is defined by the statute. 36 U.S.C. § 21703 (2002). Additionally, the statute grants certain powers to National, including the authority to:

(1) adopt a constitution, bylaws, and regulations to carry out the purposes of the corporation;

(2) adopt and alter a corporate seal;

(3) establish and maintain offices to conduct its activities;

(4) establish state and territorial organizations and local chapter or post organizations;

(5) acquire, own, lease, encumber, and transfer property as necessary to carry out the purposes of the corporation;

(6) publish a magazine and other publications;

(7) sue and be sued; and

(8) do any other act necessary and proper to carry out the purposes of the corporation.

36 U.S.C. § 21704 (2002). Pursuant to this grant of power, National has adopted its own constitution and bylaws and has created state chapters (the departments) in each state and in various other locations (55 departments altogether). Within each state, groups of Legion members may create "posts," which are local chapters of the American Legion. Currently, there are approximately 15,000 Legion posts, and about 2.8 million Legion members.

Posts are volunteer-created and usually volunteer-run. Groups wishing to create a post apply to the department that controls their state or territory for approval of a temporary charter. If the local department approves the prospective post's application for a temporary charter, National issues the temporary charter. After a probation period lasting a minimum of 90 days, the post organizers may apply to the local department for a permanent charter. The local department makes the final decision as to whether the permanent charter shall be granted.

Posts and departments are separately incorporated, as is National. National, each department, and each post all have their own leaders (commanders). National and each department have their own executive committees, and posts are encouraged (although not required) to also form such committees to help in running the post. Additionally, National, the local depart-

ments, and the posts all have their own constitutions and by-laws. Post officers are generally elected from among the members of the post.

The "Officer's Guide and Manual of Ceremonies," a guidebook distributed to Legion officials by National, states that "[t]he post is a separate and distinct unit which can, and often does, function independently." The posts elect a "District Commander" who serves as a link between the posts in his or her district and the local department.[1] The Officer's Guide describes the role of the department vis-à-vis the post:

> The department headquarters constitutes the link between the community post of the American legion and the National organization. * * * Routine business should be transacted through department headquarters. Department headquarters is familiar with the issues and conditions of state affairs. Questions of policy and organization should be referred by the post to department headquarters. Through department headquarters any information may be secured that is desired by the post, or the ways of securing it may be found.

The Officer's Guide also sets out the very limited relationship between the posts and national headquarters: "Practically all of your contacts with National Headquarters are rightfully carried through your department headquarters." Post commanders are also urged to attend National and department conventions.

Neither National nor the departments finance the local posts. Each post is expected to collect dues from all its members and deliver a portion thereof to the appropriate department, which in turn transmits a portion to National. The post owes the requisite portion of each member's dues to the department and National regardless of whether the member pays the dues. The post makes up any missing dues with money raised through post activities including, at some posts, operation of a bar or restaurant. Neither National nor the departments directly receive revenue from post bars or other post fundraising activities.

■■■ The issue presented by this appeal concerns the application of respondeat superior, a common law doctrine under which an employer may be vicariously liable for the torts of an employee committed within the course and scope of employment. *Fahrendorff v. N. Homes, Inc.*, 597 N.W.2d 905, 910 (Minn.1999). "Such liability stems not from any fault of the employer, but from a public policy determination that liability for acts committed within the scope of employment should be allocated to the employer as a cost of engaging in that business." *Id.* Urban urges that this doctrine be extended to allow a claim against either or both the Department or National on the grounds that the departments or National exercise sufficient control over the local posts to justify imposition of liability on the Department or National or both.

We turn first to the language of the statute. The Department and National argue that the CDA was only intended to apply to direct vendors of alcoholic beverages, which they are not. They claim that by specifying *licensees*, and by narrowing the previous scope of the law to "licensees" from "employers," the legislature specifically limited vicarious liability under the CDA. *Compare* Minn.Stat. § 340.941

---

**1.** The District Commander and his committee are also supposed to monitor and help their district's posts, work to attain membership goals, encourage the development of new posts and revitalization of defunct or dormant posts, and encourage the posts to create new and innovative programs and activities.

(1984) *with* Minn.Stat. § 340A.501 (2004). We agree.

The CDA reads as follows:

A spouse, child, parent, guardian, employer, or other person injured in person, property, or means of support, or who incurs other pecuniary loss by an intoxicated person or by the intoxication of another person, has a right of action in the person's own name for all damages sustained against a person who caused the intoxication of that person by illegally selling alcoholic beverages. All damages recovered by a minor under this section must be paid either to the minor or to the minor's parent, guardian, or next friend as the court directs.[2]

Minn.Stat. § 340A.801, subd. 1 (2004) (footnote added). Additionally, the legislature has specifically extended liability to licensees for the sales made by their employees:

Every licensee is responsible for the conduct in the licensed establishment and any sale of alcoholic beverage by any employee authorized to sell alcoholic beverages in the establishment is the act of the licensee for the purposes of all provisions of this chapter except sections 340A.701, 340A.702, and 340A.703.

Minn.Stat. § 340A.501 (2004).

■ The CDA created a cause of action that did not exist at common law. *Beck v. Groe*, 245 Minn. 28, 34, 70 N.W.2d 886, 891 (1955). Litigation under the CDA is entirely a creation of the legislature. *Id.* We presume, as the dissent notes, that statutes creating new causes of action do not abrogate the common law unless they do so "by express wording or necessary implication." *Shaw Acquisition Co. v. Bank of Elk River*, 639 N.W.2d 873, 877

(Minn.2002). The Urbans correctly point out that Minn.Stat. § 340A.801 does not expressly prohibit the application of respondeat superior common law. But Minn.Stat. § 340A.501, which makes licensees responsible for the sale of alcohol by their employees, necessarily implies that the legislature did not expect respondeat superior to apply to CDA liability.

■ We must presume that every statute has a purpose and that no statutory language should be deemed superfluous or insignificant. *Mayo Collaborative Servs., Inc. v. Commissioner*, 698 N.W.2d 408, 423 (Minn.2005); *Vlahos v. R & I Const. of Bloomington, Inc.*, 676 N.W.2d 672, 679 (Minn.2004). Respondeat superior would clearly impose liability on a licensee for the sale of alcohol by its employees. So if respondeat superior applies to actions under the CDA, section 340A.501 does nothing. That section can only have meaning and effect if the legislature did not intend respondeat superior to impose CDA liability on masters, including licensees, not directly at fault. Because we must assume that the legislature intended section 340A.501 to have a purpose, we must conclude that licensee liability, and thus respondeat superior, does not automatically attach to the CDA.

The principle expressio unius est exclusion alterius (the expression of one thing indicates the exclusion of another) further suggests that, in specifying that licensees are liable for the alcohol distribution of their own employees, the legislature meant that *only* licensees are vicariously liable for the alcohol distribution. The legislature has had ample opportunity in the nearly 100 years since enacting the CDA to recognize vicarious liability as it has in

**2.** Post 184 conceded that the sale of alcohol to Rolland was illegal because he was not a post member; however, they did not concede causation or that he was intoxicated when they sold him the liquor.

other statutes. *See, e.g.,* Minn.Stat. § 169.09, subd. 5(a) (Supp. 2005). In the unique context of dram shop litigation the failure of the legislature to act is significant; we decline to act where the legislature has chosen not to.

■ Our case law supports this outcome. The CDA may be "liberally construed" where its "provisions are clear as to intent and purpose," but must be "strictly construed in the sense that it cannot be enlarged beyond its definite scope." *Beck,* 245 Minn. at 34, 70 N.W.2d at 891; *see Lefto v. Hoggsbreath Enters., Inc.,* 581 N.W.2d 855, 857 (Minn.1998); *Herrly v. Muzik,* 374 N.W.2d 275, 278 (Minn.1985). The dissent argues that this dichotomy is confusing. The dissent's argument is not without merit, but the dichotomy is nonetheless a longstanding part of our CDA jurisprudence. The class of persons subject to CDA liability defines the Act's scope, and we must construe it strictly in this regard.

Furthermore, the legislature has dealt with issues arising out of the CDA and has not hesitated to amend the CDA when it has perceived a need to do so. In 1972, we concluded that the CDA as then worded permitted social-host liability because liability could be incurred by "giving" alcohol to tortfeasors. *Koehnen v. Dufuor,* 590 N.W.2d 107, 109 (Minn.1999) (citing *Ross v. Ross,* 294 Minn. 115, 117, 200 N.W.2d 149, 150 (1972)). But soon thereafter the legislature amended the CDA to remove the word "giving," and we held that the amendment makes clear that the legislature was specifically closing off social host liability. *Cole v. City of Spring Lake Park,* 314 N.W.2d 836, 840 (Minn.1982).

■ The legislature's elimination of social-host liability led us to conclude that the policy underlying the CDA is to apply liability for alcohol-related harms to *commercial vendors* who *profit* from the sale of alcohol. *Cady v. Coleman,* 315 N.W.2d 593, 595–96 (Minn.1982). But even were we to apply the CDA to the owners of licensees where owners receive alcohol sales profits, the Department and National do not receive revenue, let alone profits, from post alcohol sales except in the most attenuated circumstances (where a post needs to make up a delinquent member's dues).[3] While the Department and National do receive some indirect benefit from alcohol sales in that those sales help support Legion posts, social hosts also receive some indirect benefits that do not properly qualify as "profits" and the legislature, in its 1977 revision of Minn.Stat. § 340.95, eliminated social-host liability under the CDA.

The Urbans argue that our decision in *Hahn v. City of Ortonville* supports an extension of respondeat superior because, among other reasons, *Hahn* states that masters may be held liable for the actions

---

**3.** The dissent acknowledges that the application of respondeat superior here is unusual, but argues that it is not unprecedented. But the majority cites no Minnesota authority sanctioning the use of respondeat superior under anything remotely resembling these facts, and we have found none. The authority relied on by the dissent includes fact patterns with acknowledged control of the subsidiary by the parent corporation. *See, e.g., A. Gay Jenson Farms Co. v. Cargill, Inc.,* 309 N.W.2d 285, 291–92 (Minn.1981) (holding that a corporate creditor assuming significant control over the internal affairs of a corporate debtor was properly held liable under a jury verdict for that debtor's obligations). Indeed, on these facts it is improbable that the Department and National could be held liable on a respondeat superior theory even if we were to apply it. Both are incorporated separately from the post and have separate constitutions and executive committees, and there are 15,000 posts in the country and 584 in Minnesota, rendering day-to-day oversight or meaningful control by National or the Department impossible.

of their servants under the CDA. 238 Minn. 428, 57 N.W.2d 254 (1953). In *Hahn,* the City of Ortonville, which owned and operated a municipal liquor store, was a defendant in an action for damages allegedly caused by illegal sales of liquor conducted by its servant, the bartender. *Id.* The municipality argued that it was not liable under the CDA because it was protected by governmental immunity. *Id.* at 433, 57 N.W.2d at 259. We concluded that the municipality was subject to liability for illegal alcohol sales because those sales were not "governmental" functions and because the legislature could—and did—impose liability on a municipality in derogation of traditional immunity. *Id.* at 433–34, 57 N.W.2d at 259–60. We noted that the CDA stated that:

> [Persons injured by the intoxication of another person have] a right of action * * * against any person who, by illegally selling, bartering or giving intoxicating liquors, caused the intoxication of such person, for all damages, sustained; * * *.

*Id.* at 436, 57 N.W.2d at 260–61. We concluded, based on other statutory sources, that "person" in this context included "municipal corporations engaged in selling liquor." *Id.* at 437, 57 N.W.2d at 261. In *Hahn,* we specifically noted that the municipality in question owned the liquor store, operated it, and in doing so was involved in a "profit-making business." We noted that "a municipal liquor dispensary is normally a source of financial profit for the municipality." *Id.* at 435, 57 N.W.2d at 260.

*Hahn* is not at odds with our conclusion here. In *Hahn,* the municipality was liable for the illegal sales of alcohol made by its bartenders. Similarly, here, Post 184 is liable for any illegal alcohol sales made by its employees. While *Hahn* did use a master-servant argument in holding the

municipality liable for its bartenders' actions, *Hahn* was decided before the legislature adopted Minn.Stat. § 340A.501, amending the CDA. *See Hahn,* 238 Minn. at 428, 57 N.W.2d at 254; Act of June 5, 1985, ch. 305, Art. 7, § 1, 1985 Minn. Laws 1454, 1491 (codified at Minn.Stat. § 340A.501 (1986)). Section 340A.501, as noted earlier, makes it clear that *licensees* are automatically liable for the illegal alcohol sales of their employees. In altering the law, the legislature also necessarily altered our analysis. Given that the legislature in section 340A.501 specified that licensees are vicariously liable—implying, along with our case law, that others are not—we decline to apply a master-servant or respondeat superior analysis here, and we affirm the court of appeals

Because we conclude that the CDA did not intend nonlicensees to be held vicariously liable for violations of the CDA, an in-depth examination of respondeat superior law is unnecessary.

Affirmed.

ANDERSON, RUSSELL A., C.J., and PAGE, J., took no part in the consideration or decision of this case.

HANSON, J. (dissenting).

I respectfully dissent. On the question of the scope of the Civil Damages Act (CDA), I conclude that the CDA does not abrogate, but instead incorporates, common law principles of vicarious liability. Accordingly, I would hold that the Urbans' CDA claims may be brought against the Department and National, who are not the named licensee but who are alleged to be vicariously liable for the acts of the named licensee. On the question of whether the Department and National are vicariously liable for the acts of Post 184, I conclude that there are genuine issues of material fact sufficient to preclude the grant of

summary judgment dismissing the Urbans' complaint. Accordingly, I would reverse the grant of summary judgment and remand for trial.

### 1. *The Scope of the CDA.*

Vicarious liability, as recognized in the common law, does not describe an independent cause of action, but describes a relationship that makes one party liable for the acts of another where an underlying cause of action exists against the other. In *Lange v. National Biscuit Co.*, we said:

> Respondeat superior or vicarious liability is a principle whereby responsibility is imposed on the master who is not directly at fault. Its derivation lies in the public policy to satisfy an instinctive sense of justice.

297 Minn. 399, 403, 211 N.W.2d 783, 785 (1973). Accordingly, it is necessary to view the underlying cause of action and vicarious liability separately because these are two separate theories of liability and the analysis is different for each. Here, for example, the underlying cause of action alleged against Post 184 is for direct liability under the CDA, but the claim alleged against the Department and National is for vicarious liability under common law principles of respondeat superior.

The majority opinion commingles these two separate theories of liability, often applying the elements of one to the analysis of the other. It is largely for this reason that the conclusion of the majority—that only licensees are to be held vicariously liable for the illegal alcohol distribution—is incorrect.

### a. *The CDA does not make the licensee "vicariously" liable.*

The direct statutory liability of a licensee was added to the CDA in 1985. Act of June 5, 1985, ch. 305, art. 7, sec. 1, 1985 Minn. Laws 1454, 1491 (codified as Minn. Stat. § 340A.501 (1986)). Prior to that time a licensee who was an employer already faced common law vicarious liability for the acts of its employees. We made this clear in *Hahn v. City of Ortonville* when we held that a municipality that operates a municipal liquor store may be vicariously liable as a principal for the direct statutory liability of its employees who made illegal sales while acting within the scope of their employment. 238 Minn. 428, 438–39, 57 N.W.2d 254, 262 (1953). We based that holding both on the common law of respondeat superior and on the then current version of the CDA, which provided that any sale by an employee "is the act of the employer as well as the person actually making the sale." *Id.* (quoting Minn.Stat. § 340.941 (1946)). The point to be remembered from *Hahn* is that common law vicarious liability applies to the CDA, and a principal may be held liable under the common law of respondeat superior where its agent is statutorily liable under the CDA.

With this context in mind, it can be seen that section 340A.501 both enlarges on the common law vicarious liability of a licensee who is an employer or principal and creates a new liability for a licensee who is not an employer or principal. That section provides that "any sale of alcoholic beverage by any employee authorized to sell alcoholic beverages in the establishment *is the act of the licensee* for the purposes of [the CDA]." (Emphasis added.) I read this language to add to a licensee's common law vicarious liability as an employer by creating a direct statutory liability.

### b. *The CDA incorporates the common law of respondeat superior.*

The majority uses the wrong rule of statutory construction because it focuses on the wrong question. If the critical question was, as the majority assumes,

whether section 340A.501 imposes direct statutory liability on the Department and National, a rule of strict construction might be appropriate because that section creates a statutory cause of action and is, in one sense, penal in nature. But that is not the critical question before us. The Department and National do not have direct statutory liability, only Post 184, as licensee, and its employee who made the sale, have direct statutory liability. The critical question before us is whether, under *Hahn*, the Department and National have common law vicarious liability, as principals of Post 184, for the direct statutory liability of Post 184. In other words, the legal issue is whether section 340A.501 abrogated the common law vicarious liability that *Hahn* recognized for principals whose agents were directly liable under the CDA.

On that question, the rule of construction is clear, and it is the opposite of the one applied by the majority. Our well-settled case law on the rule of construction for statutes that create new causes of action is to presume that such statutes are consistent with the common law and to construe them not to have abrogated the common law unless they do so "by express wording or necessary implication." *Shaw Acquisition Co. v. Bank of Elk River*, 639 N.W.2d 873, 877 (Minn.2002) (quoting *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000)). *See also Rosenberg v. Heritage Renovations, LLC*, 685 N.W.2d 320, 327–28 (2004); *Bloom v. Am. Express Co.*, 222 Minn. 249, 253, 23 N.W.2d 570, 573 (1946). Although we have said that we construe such statutes "strictly," we have meant that we construe them strictly *against* the notion that they abrogate the common law. *Shaw Acquisition Co.*, 639 N.W.2d at 877;

*Bloom*, 222 Minn. at 253, 23 N.W.2d at 573. Or, to state it positively, we construe such statutes liberally in favor of the continued existence of the common law.

The majority acknowledges that section 340A.801 "does not expressly prohibit the application of respondeat superior common law." And the majority does not set forth any rationale as to why such a prohibition must be necessarily implied. Instead, the majority appears to employ the reverse presumption, that the failure to expressly mention common law principles of vicarious liability means that the legislature intended to abrogate them.

c. *The CDA should be construed liberally.*

The premise for the majority's use of this reverse presumption is that the CDA is to be strictly construed for one purpose, but liberally construed for another. The majority suggests that we construe the CDA narrowly as to its "scope," but liberally apart from its scope. That suggestion is confusing because each construction that we are asked to give to a statute that creates a cause of action involves, in some sense, the statute's "scope." And if, as the majority perhaps would acknowledge, we are to construe the CDA liberally to give effect to its remedial purposes,[1] we cannot do so and still construe the act narrowly as to its scope because the scope of the CDA is central to its remedial purpose.

For example, in deciding who are proper plaintiffs to bring a CDA claim, we have construed the CDA "liberally." *See, e.g., Hannah v. Chmielewski, Inc.*, 323 N.W.2d 781, 784 (Minn.1982); *Hempstead v. Minneapolis Sheraton Corp.*, 283 Minn. 1, 4, 166 N.W.2d 95, 97 (1969). We should use the same liberal rule of construction in

---

1. *Hahn*, 238 Minn. at 436, 57 N.W.2d at 261 (stating that the CDA "although penal in nature, [is] also remedial in character and, according to the prevailing view, [is] to be liberally construed *so as to suppress the mischief and advance the remedy*").

deciding who are proper defendants to a CDA claim. And even if we were to construe section 340A.501 strictly in determining who is subject to direct statutory liability as a licensee, this would not require us to construe the section strictly in determining whether it abrogates common law vicarious liability for those who are principals of a licensee. As noted above, the latter question requires that the section be liberally construed in favor of the survival of common law because we presume that the legislature does not abrogate the common law unless it does so expressly or by necessary implication.

In this context, the Latin phrase expressio unius est exclusio alterius (the expression of one thing indicates the exclusion of another) is not useful as a standard of construction. This Latin phrase may describe a logical conclusion where the "one thing" is inconsistent with "another." But it makes no logical sense where the two things are consistent. Here, the two things, direct statutory liability of a licensee under the CDA and vicarious liability of the licensee's principal under common law, are not only consistent, they are complementary. In different ways, each serves the same purpose of strengthening the regulation of the sale of alcohol.

As noted earlier, section 340A.501 actually expanded common law vicarious liability of a licensee by converting it to direct statutory liability. There is no principle of statutory construction that would support the suggestion that a statute that expands liability in one fashion implies an intent to simultaneously restrict liability in another fashion. The expression of the intent to make the liability of licensees no longer dependent on common law vicarious liability does not indicate any intent to restrict common law vicarious liability for those who are not affected by the statute, such as principals of a licensee.

Further, I agree with the commentators who have questioned the usefulness of this Latin phrase as a rule of statutory construction. As stated by Professor Dickerson:

Several Latin maxims masquerade as rules of interpretation while doing nothing more than describing results reached by other means. The best example is probably *expressio unius est exclusio alterius*, which is a rather elaborate, mysterious sounding, and anachronistic way of describing the negative implication. Far from being a rule, it is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds. Sometimes it does and sometimes it does not, and whether it does or does not depends on the particular circumstances of context. Without contextual support, therefore, there is not even a mild presumption here. Accordingly, this maxim is at best a description, after the fact, of what the court has discovered from context.

Reed Dickerson, *The Interpretation and Application of Statutes* 234–35 (1975) (citations omitted).

The majority suggests that section 340A.501 replaced rather than enlarged the common law respondeat superior liability of a licensee. The majority states that the application of respondeat superior would have held licensees liable for the actions of their employees without need for the statute to specify such liability. Although the premise is true (that respondeat superior may have held licensees liable for the actions of their "employees"), that liability would only exist for licensees who were also *"employers"* or principals of the

person making the illegal sale of alcohol. The common law liability was based not on one's status as a licensee but as an employer or principal. Section 340A.501 did enlarge the common law respondeat superior liability of a licensee because it eliminated at least two defenses that might have been available to a licensee under the common law: (1) the defense that the licensee was not the principal or employer of the person making the sale, and (2) the defense that the person making the sale was not acting within the scope of his or her employment or agency with the licensee.

d. *The issue of "profit" and the analogy to social hosts are irrelevant.*

The majority points out that only Post 184 receives the "profits" from the sale of alcohol. The majority further points out that even if the Department and National receive indirect benefits, this would not be enough for direct statutory liability because "social hosts" have no statutory liability even if they receive indirect benefits. But these facts are only relevant to direct liability under the CDA. And the critical issue to be decided here is not whether the Department and National are directly liable under the CDA, but whether they are vicariously liable under *Hahn* as principals of Post 184, which is directly liable under the CDA. That vicarious liability is determined by applying the common law elements of the principal-agent relationship, not by applying the statutory elements for direct liability under the CDA.

e. *The failure of the legislature to specifically address vicarious liability does not evidence an intent to eliminate it.*

The majority suggests that if the legislature had intended to permit vicarious liability under the CDA, it would have amended the CDA to provide it and, in the nearly 100–year history of the CDA, it has not done so. This suggestion fails for at least two reasons.

First, in 1953 we declared that common law vicarious liability applies under the CDA for the employer of the person making the illegal sale. *Hahn,* 238 Minn. at 438–39, 57 N.W.2d at 262. If the legislature intended to eliminate the common law of vicarious liability of employers under the CDA, it could easily have said so. But, in the over 40 years since *Hahn,* the legislature took no action to eliminate common law vicarious liability under the CDA. To the contrary, it extended direct statutory liability to licensees who otherwise would only have been subject to common law vicarious liability.

Second, the portion of the CDA that the majority relies on as having abrogated common law vicarious liability, section 340A.501, was enacted in 1985, only slightly over 20 years ago. And, until the court of appeals' decision in this case, in April of 2005, the legislature had no reason to consider that a court might interpret section 340A.501 as abrogating common law vicarious liability. Thus, there is no basis to give any meaning to the legislature's failure to further amend the CDA.

For all of these reasons, I would hold that section 340A.501 did not abrogate common law vicarious liability under the CDA and such liability exists for one who can be shown to be an employer or principal of the licensee.

2. *The Sufficiency of the Vicarious Liability Claim.*

The more difficult question is the one that was dispositive for the court of ap-

peals—whether the Urbans have raised genuine issues of material fact on the elements necessary to establish vicarious liability. The court of appeals rightly focused that question on whether the Department and National were in a principal-agent relationship with Post 184, as defined by the Restatement (Second) of Agency § 2 (2004): "A master in a master-servant relationship is one who "employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service."" *Urban v. Am. Legion Post 184,* 695 N.W.2d 153, 160 (Minn.App.2005).[2] But I disagree with the court of appeals' answer to that question: "The record does not show that National has a right to control the physical undertakings of Post 184's daily activities. At most, the record shows that National has some power over what Post 184 does, but not over how it does it." *Id.* at 161. Although I acknowledge that the application of respondeat superior law to the relationship between the Department and National and Post 184 is unusual, I conclude that it is not unprecedented. I further conclude that the Urbans have presented enough evidence of actual control and the right of control to create genuine issues of material fact.

Even though the Department and National, on the one hand, and Post 184, on the other, are separately incorporated, this does not preclude proof of the control that is necessary to create a principal-agent relationship. Unlike an alter ego theory of liability, where a parent corporation is held

liable for the acts of its subsidiary because the two are viewed as the same legal person, *Victoria Elevator Co. v. Meriden Grain Co.,* 283 N.W.2d 509 (Minn.1979), the existence of a principal-agent relationship assumes that each party to the relationship is a separate legal person. Restatement (Second) of Agency § 1(1) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act,"), § 14M cmt. a ("However a corporation may become an agent of an individual or of another corporation, as it does when it makes a contract on the other's account. Thus a subsidiary may become an agent for the corporation which controls it, or the corporation may become the agent of the subsidiary."). *See also A. Gay Jenson Farms Co. v. Cargill, Inc.,* 309 N.W.2d 285, 291–92 (Minn.1981) (holding that a corporate creditor who assumes significant control over the internal affairs of its corporate debtor created a principal-agent relationship that supported the jury verdict imposing liability on the creditor for debts of the corporate debtor).

Although we have not addressed the precise situation, courts in other jurisdictions have considered whether a parent corporation or a national organization can be vicariously liable as principal for the acts of a subsidiary corporation or local branch organization. Thus, in *Golden Spread Council, Inc. # 562 of the Boy Scouts of America v. Akins,* the Texas Supreme Court considered whether the National Boy Scouts of America (BSA)

---

**2.** *See, e.g., Frankle v. Twedt,* 234 Minn. 42, 47–48, 47 N.W.2d 482, 487 (1951) (emphasizing "the right of control, and not necessarily the exercise of that right" as the "test of the relationship of master and servant"); *Boily v.*

*Comm'r of Econ. Sec.,* 544 N.W.2d 295, 296 (Minn.1996) ("The right to control the means and manner of performance generally carries the greatest weight in a determination of the worker's status.").

could be held vicariously liable for the tortious acts of an employee of the local, BSA chartered, troop organization. 926 S.W.2d 287 (Tex.1996). The court applied the standard master-servant relationship test, but ultimately concluded that BSA had insufficient control to warrant vicarious liability. *Id.* at 290.

In an analogous situation, the Wisconsin Supreme Court addressed the question whether a corporate franchisor could be vicariously liable for the tortious acts of an employee of a corporate franchisee. *Kerl v. Dennis Rasmussen, Inc.,* 273 Wis.2d 106, 682 N.W.2d 328 (2004). The court stated that a "franchisor may be held vicariously liable for the tortious conduct of its franchisee only if the franchisor has control or a right of control over the daily operations of the specific aspect of the franchisee's business that is alleged to have caused the harm." *Id.* at 341. Although the court found that the franchisor had a "plethora of general controls on [the franchisee's] restaurant," the court rejected vicarious liability because the franchisor did not control or have the right to control the specific aspect of the business that was alleged to have caused the harm—the supervision of employees. *Id.* at 341–42. *Kerl* is valuable because it surfaces the notion that vicarious liability can be based either on the quantity of control or the quality of control.

Applying the reasoning of these cases to the present facts, the quantity of control by the Department and National over the daily operations of Post 184 may not be sufficient to create a principal-agent relationship for all purposes. But I am persuaded by the reasoning in *Kerl* that the Urbans have presented sufficient evidence that the Department and National have the right to control "the specific aspect of

[Post 184's] business that is alleged to have caused the plaintiffs' harm." *Kerl,* 682 N.W.2d at 341.

The specific aspect of Post 184's business that is alleged to have caused the harm is the sale of alcohol to one who was not a member of the American Legion. The drunk driver who was served alcohol at Post 184, allegedly in violation of Minn. Stat. § 340A.502 (2004) because he was obviously intoxicated, was not a member of the American Legion. The Department and National have a specific rule that prohibits posts from serving alcohol to non-members, and have mandated specific procedures that a post must follow to assure compliance with this rule—"police the doors," "check the [membership] cards" and "get rid of" nonmembers who get in the post bar. This rule is important to the Department and National because they have obtained from the Internal Revenue Service a group tax exemption that is based on the tax exempt purposes of the Department and National. The exemption requires bar operations of qualified posts to provide service only to members of National and not to the general public. To maintain that exemption, the Department and National must annually represent to the Internal Revenue Service that the qualified posts are under their supervision and control. According to evidence presented by the Urbans, National acknowledges that the group exemption is placed in jeopardy if any post violates this rule and serves alcohol to persons who are not members of National.

I conclude that the Urbans have presented sufficient evidence to raise genuine issues of material fact on the claim that the Department and National are vicariously liable at common law for the statutory liability of Post 184 under the CDA.

Accordingly, I would reverse the summary judgment and remand for trial.