*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2016).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0530**

RK Midway, LLC, et al., petitioners,
Appellants,

vs.

Metropolitan Council,
Respondent.

**Filed January 23, 2017
Affirmed
Bratvold, Judge**

Ramsey County District Court
File No. 62-CV-14-8455

Joseph M. Finley, Scott Harris, Calvin P. Hoffman, Stinson Leonard Street LLP, Minneapolis, Minnesota (for appellants)

Barbara M. Ross, Ashleigh M. Leitch, Best & Flanagan LLP, Minneapolis, Minnesota (for respondent)

Peter G. Mikhail, Kennedy & Graven, Chartered, Minneapolis, Minnesota (for amicus curiae Minnesota Eminent Domain Counsel Association)

Jon W. Morphew, Morphew Law Office, P.L.L.C., Minneapolis, Minnesota; Kirk Schnitker, Schnitker Law Office, P.A., Spring Lake Park, Minnesota; and Bradley J. Gunn, Stuart Alger, Malkerson Gunn Martin, LLP, Minneapolis, Minnesota (for amicus curiae Minnesota Eminent Domain Institute)

        Considered and decided by Worke, Presiding Judge; Stauber, Judge; and Bratvold, Judge.

UNPUBLISHED OPINION

**BRATVOLD**, Judge

This mandamus appeal stems from the construction of the Central Corridor Light Rail Transit Project (CCLRT) in the Civil East segment of the project in Saint Paul, Minnesota. Appellants are property owners and seek review of the district court's decision granting summary judgment in favor of respondent Metropolitan Council (Met Council). Appellants argue that the district court erred in determining that no constitutional taking occurred when respondent's contractor damaged appellants' property. Because the contractor retained the right to control its work and employees, we conclude that the contractor was not respondent's agent and, therefore, not a government actor when it damaged appellants' property. Thus, we affirm summary judgment because no constitutional taking occurred.

## FACTS

Appellants RK Midway, LLC and REIN Midway Limited Partnership (collectively, Midway) own a parcel of land (the property) on which they operate the Midway Shopping Center with multiple tenants. The property is located on University Avenue in Saint Paul, Minnesota and contains "paved internal private drives," parking lots, and sits on approximately 23.45 acres of land. The western boundary of the property abuts Snelling Avenue and the eastern boundary abuts Pascal Avenue.

Met Council was designated as the "responsible public authority" for planning and constructing the CCLRT. *See* Minn. Stat. § 473.3994, subd. 1a (2016). The CCLRT, which spans an 11-mile strip and connects Saint Paul and Minneapolis, was divided into four

primary construction contracts. One contract involved the Civil East segment, which spans six miles and is located in the Midway area of Saint Paul.

In June 2010, Walsh Construction Company (Walsh), which is not a party to this action, was awarded the construction contract for the Civil East segment. The contract between Walsh and Met Council included provisions allocating the parties' rights, responsibilities, and liability for any damages.

Walsh agreed to be "*solely responsible for the means, methods, and techniques of construction*, except for means, methods, or techniques expressly detailed on the [d]rawings or explicitly required by the [s]pecifications." (Emphasis added.) Walsh was additionally responsible for "supervis[ing], inspect[ing], and direct[ing]" the work under the contract and was "solely responsible for the means, methods, techniques, sequence, and procedures of construction."

On the other hand, the contract provided that Met Council retained the right to set the construction schedule, interpret the contract, reasonably object to Walsh's employees or subcontractors, approve Walsh's shop drawings and parking plan, order changes to the work, reject defective work and require Walsh to fix defective work at its own expense, inspect the construction sites, and refuse payment to Walsh upon specified conditions. The contract also provided that Met Council "will not supervise, direct, or have control or authority over, nor be responsible for, [Walsh's] means, methods, techniques, sequences, or procedures of construction."

Relevant to the issues in this appeal, Walsh also promised to conduct construction activities only within the properties "identified in and permitted by" the contract.

3

Additionally, Walsh agreed to enforce this provision among its employees and agents. Met Council was responsible for providing "the lands upon which the [w]ork is to be performed" and for furnishing a 10-acre lot (Snelling Yard) that Walsh could use for staging, storage, and office areas. If Walsh needed additional space to conduct construction activities, Walsh agreed to be responsible for procuring additional land and access points.

If Walsh damaged adjacent property, the contract provided that Walsh assumed "full responsibility for damage to such area, or to the owner or occupant thereof or of adjacent areas, resulting from the performance of the [w]ork." Walsh also promised to "restore to original condition all property not designated for alteration" by the contract. Walsh further agreed to repair "[d]amage or disturbance to adjacent properties" at Walsh's expense. Finally, Walsh agreed to "indemnify, defend, and hold harmless [Met Council] . . . against claims, costs, losses, and damages caused by, arising out of, or resulting from the performance of the [w]ork."

Before Walsh began to perform under the contract, Met Council and the Minnesota Department of Transportation (MnDOT) worked together and initiated condemnation proceedings to acquire the property necessary to construct the CCLRT. MnDOT's petition was granted on February 7, 2011, and, specific to Midway's property, MnDOT and Met Council acquired 2,190 square feet for temporary construction easements. MnDOT also condemned an 80-foot wide, 6-mile long corridor down University Avenue for purposes of construction work.

Consistent with the parties' contract, Walsh submitted a parking plan designating the Snelling Yard for employee parking, and Met Council provided Walsh with the

4

Snelling Yard for staging and with existing public roads for access to the site. Nonetheless, the parties agree that Walsh, without Midway's authorization, repeatedly conducted construction-related activities outside of the areas provided for in the contract. For purposes of summary judgment, Midway established that Walsh's conduct damaged Midway's property because, for example, it offered evidence that Walsh caused a water line on Midway's property to break and damage a sewer grate.

Midway conducted traffic surveys on June 30, 2011 and July 7, 2011 and observed Walsh vehicles make "85 trips through the [property]" and 148 trips through the property, respectively. In July 2011, Midway's property manager notified Met Council of "multiple trespasses" by dump trucks, loaders, semi-trucks, and cement trucks driving through the property and parking in the lots. The property manager also reported that muddy water was "being pumped into the private alley behind the [property]." Walsh additionally used a private alley behind the property to access the construction site.

After receiving complaints about Walsh's conduct, Met Council sent emails to Walsh on three separate dates in July 2011, requesting that the conduct stop. On July 28, 2011, because the conduct had not stopped, Met Council issued a nonconformance report to Walsh, and outlined Walsh's failure to work within the land specified in the contract. On August 2, 2011, a MnDOT project liaison observed several Walsh vehicles using property not provided for in the contract and the liaison notified Walsh immediately about the conduct. Met Council issued another nonconformance report to Walsh on October 18, 2011, because it had received complaints of Walsh construction vehicles parking in private lots and using private drives. Met Council received more complaints of Walsh using the

property for access in the spring of 2012, and Met Council directed Walsh to post signs reading, "No Construction Vehicles." Met Council met with Walsh to discuss these complaints, and Walsh assured Met Council that it would comply with and enforce the contract terms. The parties agree that Walsh's conduct stopped sometime in fall 2012, after Walsh had substantially completed its work.

On December 23, 2014, two years after Walsh ceased work on the Civil East segment of the CCLRT, Midway filed a petition for an alternative writ of mandamus, requesting the district court to compel Met Council to initiate inverse condemnation proceedings regarding the property Walsh had taken and/or damaged during construction of the Civil East segment, or for Met Council to show cause. Minn. Stat. § 586.03. The parties filed cross-motions for summary judgment. The district court granted Met Council's motion for summary judgment, determining that it was undisputed that Walsh "regularly traversed" on Midway's property without the authorization of Midway or Met Council. Because Walsh was an independent contractor and not an agent of Met Council, the district court concluded that no de facto taking occurred. The district court additionally denied Midway's mandamus petition because Midway had an adequate remedy at law by suing Walsh in trespass. This appeal follows.

## DECISION

Midway argues that the district court erred in entering summary judgment after determining that no constitutional taking had occurred and that Midway had an adequate remedy at law. Because we agree with the district court's determination that no

6

constitutional taking occurred, we affirm summary judgment on that basis and need not decide whether Midway had an adequate remedy at law.

## I. Standard of review.

This court reviews "a district court's decision to grant summary judgment de novo to determine whether any genuine issue of material fact exists and whether the district court correctly applied the law." *Citizens State Bank Norwood Young Am. v. Brown*, 849 N.W.2d 55, 61 (Minn. 2014). Summary judgment will be affirmed "if it can be sustained on any grounds." *Myers through Myers v. Price*, 463 N.W.2d 773, 775 (Minn. App. 1990), *review denied* (Minn. Feb. 4, 1991). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, establishes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Citizens State Bank*, 849 N.W.2d at 61; Minn. R. Civ. P. 56.03. A material fact is one that will "affect the result or outcome of the case depending on its resolution." *Zappa v. Fahey*, 310 Minn. 555, 556, 245 N.W.2d 258, 259–60 (1976). "To raise a genuine issue of material fact[,] the nonmoving party must present. . . evidence . . . [that would] permit reasonable persons to draw different conclusions." *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn. 2009); Minn. R. Civ. P. 56.05 (responding party "may not rest upon the mere averments or denials" of adverse party's pleading but must present "specific facts" showing "a genuine issue for trial").

**II.** **The district court did not err in determining Walsh's conduct was not government action, and, therefore, no constitutional taking occurred.**

"Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured." Minn. Const. art. 1, § 13. A taking includes "every interference, under the power of eminent domain, with the possession, enjoyment, or value of private property." Minn. Stat. § 117.025, subd. 2 (2016). A taking requires government action. *Chenoweth v. City of New Brighton*, 655 N.W.2d 821, 824 (Minn. App. 2003), *review denied* (Minn. Apr 29, 2003). A de facto taking occurs when "an entity clothed with eminent-domain power substantially interferes with an owner's use, possession, or enjoyment of property." *Hebert v. City of Fifty Lakes*, 744 N.W.2d 226, 229 (Minn. 2008) (quoting *Black's Law Dictionary* 1493 (8th ed. 2004)).

"Actions for inverse condemnation must be brought to the court through an action in mandamus." *Nolan & Nolan v. City of Eagan*, 673 N.W.2d 487, 492 (Minn. App. 2003), *review denied* (Minn. Mar. 16, 2004). In order to prevail on a mandamus action, the petitioner must establish that the government failed to perform an official duty imposed by law. Minn. Stat. § 586.03 (2016); *see also Harkins v. Bd. of Supervisors of Scott Cty.*, 2 Minn. 342, 343–44, 2 Gil. 294 (1858). For mandamus seeking inverse condemnation, a district court "must decide whether a taking of property has occurred in the constitutional sense." Minn. Stat. § 586.03 (2016); *Nolan*, 673 N.W.2d at 492. When facts are undisputed, "and the question presented is purely a question of law," this court will review a denial of a mandamus petition de novo. *Castor v. City of Minneapolis*, 429 N.W.2d 244, 245 (Minn. 1988).

8

The threshold issue in this appeal is whether a constitutional taking occurred through government action.[1] Midway claims that the continuing physical invasions by Walsh amounted to a de facto taking by Met Council. The district court granted summary judgment, relying on the undisputed facts and the parties' contract. Specifically, the district court cited contract provisions that Walsh alone was responsible for the "means, methods and techniques of the construction," Walsh was to provide for any additional lands that it required for the project, and Walsh was required to restrict operations and equipment to "areas defined in the contract documents." Because no agency relationship existed between Walsh and Met Council, the district court concluded that Walsh's conduct, including the invasions of Midway's property and related damages, was not government action and no constitutional taking occurred.

Midway contends that Walsh's conduct was government action, posing three alternative theories. First, an agency relationship existed between Met Council and Walsh.[2]

---

[1] Amicus for appellants, Minnesota Eminent Domain Institute (MEDI), does not discuss whether an agency relationship exists and instead argues that a temporary taking is compensable as a matter of law. Neither Midway nor Met Council argue that a temporary taking is not compensable. Rather, the parties dispute whether Walsh's conduct rises to the level of a temporary taking. Because we conclude that Walsh was not a government agent, we do not reach the temporary taking issue.

[2] Amicus for respondent, Minnesota Eminent Domain Counsel Association (MEDCA), argues that, as a matter of law, a principal-agent relationship did not exist between Met Council and Walsh, because Met Council lacks the authority to delegate its eminent domain power to Walsh. *See Muehring v. Sch. Dist. No. 31 of Stearns Cty.*, 224 Minn. 432, 436, 28 N.W.2d 655, 658 (1947) (stating that "[i]t is elementary that a public corporation, agency, or officer to whom governmental power has been delegated by statute cannot redelegate such delegated power"). Because this issue is not necessary to our resolution of this appeal, we do not address it.

9

Second, Midway argues that Met Council ratified Walsh's conduct. Finally, Midway asserts that Met Council "acted in concert" with Walsh. We address each theory in turn.

### A.      Appellants' agency theory fails.

An agency relationship exists when there is a "manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act." *Urban ex rel. Urban v. Am. Legion Post 184*, 695 N.W.2d 153, 160 (Minn. App. 2005) (quotation omitted), *aff'd on other grounds*, 723 N.W.2d 1 (Minn. 2006). A principal employs an agent and has control, or the right to control, the agent's conduct within the scope of the agency. *Id*. "The *right* of control, and not necessarily the exercise of that right, is the test of the relation of [principal and agent]." *Frankle v. Twedt*, 234 Minn. 42, 47, 47 N.W. 2d 482, 487 (1951) (emphasis in original). The right of control extends not only to "*what* is to be done, but primarily over *how* it is to be done." *Id*. (emphasis in original). Independent contractors are not agents because they are "not subject to any control or right of control with respect to their physical conduct in carrying out the undertaking." *Urban*, 695 N.W.2d at 160 (quotation omitted).

Existence of an agency relationship is usually a question of fact. *Jurek v. Thompson*, 308 Minn. 191, 196, 241 N.W.2d 788, 791 (1976). But, the construction and effect of an unambiguous contract is a question of law that this court reviews de novo. *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003). Also, the application of law to undisputed facts is a question of law. *In re Daniel*, 656 N.W.2d 543, 545 (Minn. 2003).

Midway argues that the district court did not construe the relevant contract provisions as a whole when it decided that no agency relationship existed; and, under the

contract, Met Council retained control over Walsh and the manner in which Walsh's work was completed.[3] Met Council responds that Midway misconstrues the contract's plain language.

Our analysis starts with the contract language, which provided that Walsh was "solely responsible for the means, methods, and techniques of construction." Additionally, Walsh promised to direct and supervise all of the work and was responsible for any acts or omissions committed by its employees or subcontractors. Specifically, the contract also provided that if Walsh needed access to additional lands, Walsh would provide for access. Moreover, Walsh agreed to confine its equipment, materials, and operations to areas designated in the contract documents. Thus, the contract unambiguously provided that only Walsh had the right to control the conduct of its employees.

Notably, Midway does not contend that this contract language is ambiguous or that evidence outside the contract establishes that Met Council retained control over Walsh's work or authorized Walsh's allegedly tortious conduct on Midway's property. Instead, Midway argues that the contract gave Met Council the right to refuse payment to Walsh and to stop work if the contract terms were violated. Midway contends that these provisions gave Met Council ultimate control over performance of the contract. It is undisputed that Met Council contacted Walsh officials, sent emails, and issued nonconformance reports when it learned that Walsh employees were operating outside the contract terms. However,

---

[3] We note that neither Midway nor Met Council provided the entire contract on appeal. For purposes of this appeal, we assume that the parties have provided the relevant provisions of the contract.

11

Met Council's contractual right to stop work is different from Walsh's right to control the "means, methods, and techniques of construction." Thus, Met Council's right to stop work did not create an agency relationship with Walsh.

Our conclusion that Walsh was not Met Council's agent is further supported by the contract provisions stating that Walsh agreed to indemnify Met Council for any damages or claims. These provisions are similar to the operative language in a contract examined in *Lowry Hill Props. Inc. v. Ashbach Constr. Co.*, where a property owner sued a contractor for damages caused during a construction project performed for the state. *Lowry Hill I*, 291 Minn 429, 194 N.W.2d 767 (1971). The state was not a party to *Lowry Hill I*, but the supreme court recognized that a separate inverse condemnation claim was pending. *Id*. at 438, 194 N.W.2d at 773. To determine the contractor's liability, the supreme court relied on an indemnification provision under which the contractor agreed to hold the state harmless from damage to private property where the damage was attributed to the contractor. *Id*. at 437, 194 N.W.2d at 772–73.

The supreme court reasoned that the indemnification clause demonstrated that "[t]he state chose not to be required to compensate by eminent domain, agreeing instead . . . that all damage to third parties be . . . paid by the contractor." *Id*., 194 N.W.2d at 773. The supreme court held that the indemnification clause established that the contractor was an independent contractor and "responsible for any and all damage caused." *Id*. at 437, 194 N.W.2d at 772. The supreme court reversed the summary judgment decision that had determined the contractor was not liable. *Id*., 194 N.W.2d at 774.

12

*Lowry Hill I*'s reasoning applies here. Walsh agreed to be solely responsible for any damage caused during performance of its work and promised that it would indemnify Met Council against all claims. In a separate provision, Walsh additionally promised to be responsible for damage to adjacent properties, such as Midway Shopping Center. These contract provisions indicate that the parties anticipated Walsh was an independent contractor, not an agent for Met Council.

Midway claims several cases support its position. But the cases Midway cites are inapposite because the government was directly involved in the alleged taking, or the government, through a contract, retained the right to control the acts of a third party, who was involved in the alleged taking. *See, e.g.*, *De Vries v. City of Austin*, 261 Minn. 52, 60–61, 110 N.W.2d 529, 536 (1961) (holding city liable in negligence because contract provided that city retained "right to control every detail of the work" regardless of who performed it, and city engineer had affirmative duty to assist in locating gas lines).[4]

Midway also argues that Walsh was working "in furtherance of a public project," which makes it Met Council's agent. Midway cites caselaw that it claims supports the premise that third-party "contractors building public transportation projects are the agents

---

[4] *See also Clark v. City of Brainerd*, 210 Minn. 377, 378, 298 N.W. 364, 365 (1941) (holding city liable in trespass for damages to house caused by city employee's excavation work because "[u]nder their contract, broad powers of supervision and inspection were conferred"; specifically, city charter provided city engineer "shall direct the *manner of performing* all such work") (internal quotation marks omitted) (emphasis added); *Westerson v. State*, 207 Minn. 412, 416–17, 291 N.W. 900, 902–03 (1940) (holding state liable in negligence for improper construction and maintenance of drainage ditches that caused flooding on appellant's land).

of the public." Midway misconstrues this caselaw, which involves either direct governmental action or action expressly authorized by the government. *See, e.g.*, *Dickerman v. City of Duluth*, 88 Minn. 288, 294, 92 N.W. 1119, 1120–21 (1903) (holding constitutional taking occurred when railroad company built viaduct in accordance with plans revised by city and city added work that changed road grade in front of appellant's house, thus, city was responsible for damage).[5] Here, Midway proffers no evidence that Met Council directed or authorized Walsh to enter upon Midway's property. To the contrary, the contract provided that Walsh must conduct all construction activities within the properties listed in the contract and shown on the contract drawings and Met Council repeatedly notified Walsh to stop all activities outside of the contract areas.

In light of the contract provisions and the absence of any evidence that Met Council directed or authorized Walsh's entries onto Midway's properties, Walsh was not Met Council's agent and, as a matter of law, no government action or constitutional taking occurred. Thus, the district court did not err in granting summary judgment.

---

[5] *See also Konze v. City of Onamia*, No. A11-2263, 2012 WL 4328953 at *3 (Minn. App. Sept. 24, 2012), *review denied* (Minn. Dec. 18, 2012) (holding city liable in inverse condemnation where third-party contractor constructed road outside of established construction area, public continued to use roadway, city did not remove improvements or utilities, and city did not restore appellant's property to its original condition). An unpublished decision of this court is not precedent. Minn. Stat. § 480A.08, subd.3 (2016); *see also Vlahos v. R&I Constr. of Bloomington, Inc.*, 676 N.W.2d 672, 676 n.3 (Minn. 2004) (stating that unpublished opinions are not precedential) (citing *Dynamic Air, Inc. v. Bloch*, 502 N.W.2d 796, 801 (Minn. App. 1993)). We note that Midway's reliance on *Konze* is misplaced. *Konze* involved a public road, constructed on private property, which continued in use after the project ended. Here, Walsh did not construct anything that remained in use on Midway's property after the project ended.

14

### B.  Appellants' ratification theory fails.

Alternatively, Midway argues that it established government action because Met Council ratified Walsh's damage to Midway's property by allowing Walsh to continue working and by paying Walsh incentive payments. Ratification of an unauthorized act means that "a party, with full knowledge of all material facts, confirms, approves, or sanctions the other's act[,]" thus creating an agency relationship in which the principal is bound "to the same extent" as if the act had been done under prior authority. *Fox v. Morse*, 255 Minn. 318, 324, 96 N.W.2d 637, 641 (1959). Met Council responds that this issue is not properly before the court because Midway did not raise it in the district court. "A reviewing court must generally consider only those issues that the record shows were presented *and considered* by the [district] court in deciding the matter before it." *Thiele v. Stich*, 425 N.W.2d 580, 582 (quotation omitted) (emphasis added). "Nor may a party obtain review by raising the same general issue litigated below but under a different theory." *Id.*

Midway acknowledges that it did not specifically raise this issue before the district court, but argues that this court may consider issues that are "a refined version of an argument raised below." *See Jacobson v. $55,900 in U.S. Currency*, 728 N.W.2d 510, 522–23 (Minn. 2007). To make its point, Midway refers to one comment by the district court to show it considered the general concept of ratification. The district court stated that Walsh did not have a good reputation for abiding by its contracts, yet Met Council "allowed [the work] to go on with just a 'Stop doing it' kind of a thing." Midway omits, however, that the district court concluded that Met Council's response to Walsh "ha[d] very little to do, if anything, with the request for mandamus."

15

A passing comment by the district court does not preserve an issue for appeal. *See State v. Morse*, 878 N.W.2d 499, 501–02 (Minn. 2016) (stating "[t]he court of appeals erred in addressing" issue not raised below and that it appeared that "[t]he court of appeals . . . seized on the district court's passing comment" yet "comment was not essential to the district court's holding"). Based on our review, Midway failed to raise ratification as an issue until it filed a brief with this court, caselaw regarding ratification was not cited in the district court, and the parties did not develop a record regarding ratification. *See Thiele*, 425 N.W.2d at 583 (finding error where appellate court addressed an issue not raised below, record was undeveloped, and factual allegations were found only in appellant's brief). Thus, Midway's ratification theory is not properly before us.

Moreover, we disagree with Midway's claim that ratification is "part and parcel" of its agency argument. If ratification is implicit in agency issues, then the relevant caselaw and arguments would have been discussed in the district court, and they were not. Even if we were to consider Midway's ratification theory based on the evidence, Midway offered no evidence that Met Council approved of Walsh's alleged tortious conduct. To the contrary, the record evidence is that Met Council reprimanded Walsh for its conduct in violation of the contract. Therefore, we conclude that Midway is not entitled to relief on this theory.

### C.     Appellants' action in concert theory fails.

Alternatively, Midway argues that it has established government action because Met Council "acted in concert" with Walsh's alleged tortious conduct. Action in concert is a theory of tort liability that holds multiple tortfeasors responsible for a single injury. *See,*

16

*e.g., Tolbert v. Gerber Indus.*, 255 N.W.2d 362, 366 n.1 (Minn. 1977) (describing various theories on which joint tortfeasors may be held liable). Midway's argument fails, initially, because Midway did not raise this issue in the district court, just as it failed to raise ratification. *Thiele*, 425 N.W.2d at 582. Midway did not seek relief for a tort, or allege that Met Council and Walsh were joint tortfeasors, nor did Midway cite relevant caselaw on this legal theory during summary judgment proceedings, nor did the parties develop the record regarding this issue. Thus, the issue is not properly before us.

Even so, the caselaw cited by Midway is inapplicable to inverse condemnation.[6] None of Midway's caselaw involves "actions in concert" that are also held to be a constitutional taking.[7] For example, Midway relies on *Wilson v. Ramacher* to support this theory. 352 N.W.2d 389 (Minn. 1984).[8] In *Wilson*, the supreme court held that a landowner

---

[6] We also note that Midway does not establish that Minnesota has recognized "action in concert" as a theory of tort liability.

[7] *See Ehrhardt v. Wells Fargo & Co.*, 134 Minn. 58, 60 158 N.W. 721, 722 (1916) (holding where defendant company is aware of false imprisonment, and company's employee directs false imprisonment to continue, company is liable); *Helppie v. Nw. Drainage Co.*, 127 Minn. 360, 361, 149 N.W. 461, 461–62 (1914) (holding where employee intentionally trespassed on land while acting within scope of employment, employer may be liable for trespass even if unaware of it, but remanding case so jury could determine if trespass was involuntary for purposes of awarding treble damages); *Sanborn v. Sturtevant*, 17 Minn. 200, 201 (1871) (in action for trespass, one who claims to own land and sells that land to others to allow buyers to cut timber is liable in trespass to true owner of land).

[8] Wilson, a landowner, lived between two newly developed subdivisions. 352 N.W.2d at 391. The entirety of the subdivisions and Wilson's lot sloped downward, so that the natural water runoff flowed from one subdivision, over Wilson's land, through the other subdivision. *Id*. Wilson sued the owners of the "upstream" and "downstream" tracts, as well as the city. *Id*. at 391–92. His claims against the city alleged negligence in issuing permits and "platting, planning, [and] approving" the development of the subdivision, and

could amend his complaint to allege inverse condemnation where his property had been damaged by runoff water and the city had approved adjacent developments that affected the runoff. *Id*. at 395. The supreme court reasoned that the landowner had "misconceived his remedy," and that, because the complaint alleged "a trespass and a direct invasion of [his] property" due to the diversion of surface water by the city's municipal storm sewer, the damages "appear[ed] to constitute a taking." *Id*. at 394.

Midway asserts that *Wilson* was decided on joint tortfeasor theory, supporting its premise that the government is liable in inverse condemnation where a third-party working on a public project trespasses on private property. Midway is correct that *Wilson* involved tort claims against multiple defendants, one of which was a city. However, *Wilson* indicates that the city's ownership and operation of a storm sewer provided the government action necessary to hold the city liable in inverse condemnation. Midway cannot circumvent the requirement for government action by asserting that Met Council and Walsh are joint tortfeasors without offering evidence that Met Council participated in the alleged tort.

Because Midway did not raise this issue in the district court and Midway's legal authorities do not support its position, we conclude Midway is not entitled to relief on its "action in concert" theory.

**Affirmed.**

---

trespass. *Id*. at 392. The city moved for summary judgment, and the district court granted summary judgment based on governmental immunity. *Id*.